No. 2023-1726

# United States Court of Appeals for the Federal Circuit

———————————

OCEAN SEMICONDUCTOR LLC,

*Appellant,*

v.

APPLIED MATERIALS, INC.,

*Appellee.*

———————————

On Appeal from the USPTO Patent Trial and Appeal Board
in *Inter Partes* Review No. IPR2021-01340

---

**PRINCIPAL BRIEF OF APPELLANT OCEAN SEMICONDUCTOR LLC**

---

<div style="text-align:right">

Joseph J. Zito
jzito@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorney for Appellant*
*Ocean Semiconductor LLC*

</div>

July 21, 2023

Relevant claims of U.S. Patent No. 6,725,402 (the "'402 patent") include:

**1**. A method comprising:

receiving at a first interface operational state data of a processing tool related to the manufacture of a processing piece,

sending the state data from the first interface to a fault detection unit, wherein the act of sending comprises:

sending the state data from the first interface to a data collection unit; accumulating the state data at the data collection unit;

translating the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit; and

sending the translated state data from the data collection unit to the fault detection unit;
determining if a fault condition exists with the processing tool based upon the state data received by the fault detection unit;

performing a predetermined action on the processing tool in response to the presence of a fault condition; and

sending an alarm signal indicative of the fault condition to an advanced process control framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit,

wherein performing a predetermined action further comprises sending a signal by the framework to the first interface reflective of the predetermined action.

**6**. The method of claim **5**, wherein comparing comprises comparing the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within acceptable operational limits.

**8**. A system comprising:

a processing tool adapted to manufacture a processing piece,

a first interface, coupled to the processing tool, the first interface adapted to receive operational State data of the processing tool related to the manufacture of the processing piece;

a fault detection unit adapted to determine if a fault condition exists with the processing tool based on said operational state data;

a framework adapted to perform a predetermined action on the processing tool in response to the presence of a fault condition;

wherein the first interface comprises a data collection unit adapted to receive and accumulate the state data as the data is received by the first interface, translate the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit, and to send the translated state data from the data collection unit to the fault detection unit;

wherein the fault detection unit is further adapted to send an alarm signal indicative of the fault condition to the framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit; and

wherein the framework is further adapted to send a control signal to the first interface reflective of the predetermined action providing that a fault condition exists.

**11**. The system of claim **10**, wherein the fault detection unit is adapted to compare the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within acceptable operational limits.

**15**. An apparatus, comprising:

an interface adapted to receive operational state data from a processing tool and to provide the operational state data;

a controller adapted to:

receive the operational state data from the interface;

determine if a fault condition exists with the processing tool based on the operational state data received from the interface; and

perform a corrective action on the processing tool in response to the presence of a fault condition,

wherein the controller is adapted to perform the predetermined action comprises the controller adapted to send a signal to the interface reflective of the predetermined action.

**17**. The apparatus of claim **15**, wherein the controller is adapted to compare at least a portion of operational data to model data to determine if a fault condition exists.

Appx78-79.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1726

**Short Case Caption** Ocean Semiconductor LLC v. Applied Materials, Inc.

**Filing Party/Entity** Ocean Semiconductor LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/21/2023     Signature:     /s/Joseph J. Zito

Name:     Joseph J. Zito

i

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Ocean Semiconductor LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

ii

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| Timothy Devlin<br>Devlin Law Firm LLC | Henrik Parker<br>Devlin Law Firm LLC | |
| Alex Chan<br>Devlin Law Firm LLC | Joel W. Glazer<br>Devlin Law Firm LLC | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. vi

STATEMENT OF RELATED CASES ................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 1

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................. 3

I.      BACKGROUND OF THE '402 PATENT ................................. 3

II.     RELEVANT '402 PATENT CLAIMS .................................... 5

III.    ASSERTED REFERENCES ..................................................... 8

        A.      Coronel ......................................................................... 8

        B.      Fox ................................................................................ 8

IV.     PROCEDURAL HISTORY ...................................................... 8

SUMMARY OF THE ARGUMENT ................................................. 10

ARGUMENT .................................................................................... 12

I.      STANDARD OF REVIEW ...................................................... 12

II.     THE BOARD INCORRECTLY DETERMINED THAT THERE WAS A
        MOTIVATION TO COMBINE CORONEL AND FOX ............................. 13

        A.      Dr. Hatalis' Testimony Is Insufficient Proof of a Motivation to
                Combine ....................................................................... 13

        B.      Coronel and Fox Are Incompatible ............................ 21

III.    THE BOARD ERRED IN DETERMINING THE "ADVANCED PROCESS
        CONTROL FRAMEWORK" OF CLAIM 1 WAS TAUGHT BY
        CORONEL ............................................................................. 24

        A.      The Board Failed to Consider All of the Evidence Regarding the
                "Advanced Process Control Framework" .................... 24

                1.  Dr. Hatalis Changed His Definition of APC Framework ........... 24

                2.  The Board Erred in Determining that Ocean Had Waived Argument
                    Based on Dr. Hatalis' Deposition ................................ 26

B.    Applied Did Not Meet Its Burden to Show That All of the Limitations of Claim 1 Were Taught by Fox and Coronel.....................................29

IV.   NO REASONABLE FACTFINDER COULD FIND THAT CLAIMS 6, 11 AND 17 WERE OBVIOUS IN LIGHT OF CORONEL AND FOX ...........31

A.    Neither Fox nor Coronel Teaches or Suggests the "Fault Model Data" of Claims 6 and 11 or the "Model Data" Of Claim 17 .......................31

B.    The Board Did Not Give Proper Weight to Objective Indicia of Nonobviousness......................................................................................35

V.    CONCLUSION...........................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*,
  949 F.3d 1366 (Fed. Cir. 2020) ...............................................20

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) ...............................................20

*Adapt Pharma Operations Ltd v. Teva Pharms. USA, Inc.*,
  25 F.4th 1354 (Fed. Cir. 2022) ...............................................38

*Ariosa Diagnostics v. Verinata Health, Inc.*,
  805 F.3d 1359 (Fed. Cir. 2015) ...............................................12

*Axonics, Inc., v. Medtronic, Inc.*,
  2022-1451, 2022-1452, 2023 U.S. App. LEXIS 17231 (Fed. Cir. July 10, 2023)
  ....................................................................... 16, 17

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) ........................................... 13, 28

*Chemours Co. FC, LLC v. Daikin Indus.*,
  4 F.4th 1370 (Fed. Cir. 2021) ...............................................12

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)...........................................................12

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990) ..........................................................12

*Ecolochem, Inc. v. Southern Cal. Edison Co*,
  227 F.3d 1361 (Fed. Cir. 2000) ...............................................38

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ......................................................... 16, 38

*Henny Penny Corp. v. Frymaster LLC*,
  938 F.3d 1324 (Fed. Cir. 2019) ...............................................16

*Highmark Inc. v. Allcare Health Mgt. Sys., Inc.*,
  572 U.S. 559 (2014) ..........................................................12

*In re Bond*,
  910 F.2d 831 (Fed. Cir. 1990) ...............................................32

*In re Magnum Oil Tools Int'l, Ltd.*,
   829 F.3d 1377 (Fed. Cir. 2016) ...................................................... 21, 35

*In re Mahurkar Patent Litigation*,
   831 F. Supp. 1354 (N.D. Ill. 1993) ....................................................38

*In re Natural Alternatives, LLC*,
   659 Fed. Appx. 608 (Fed. Cir. 2016) ..................................................24

*In re NuVasive, Inc.*,
   842 F.3d 1376 (Fed. Cir. 2016) ..........................................................19

*In re Piasecki*,
   745 F.2d 1468 (Fed. Cir. 1984) ..........................................................38

*Indivior Inc. v. Dr. Reddy's Labs., S.A.*,
   930 F.3d 1325 (Fed. Cir. 2019) ..........................................................17

*Intel Corp. v. VLSI Tech. LLC*,
   858 Fed. Appx. 349 (Fed. Cir. 2021) ..................................................29

*PAR Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014). .........................................................16

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017) ..........................................................12

*Rambus Inc. v. Rea*,
   731 F.3d 1248 (Fed. Cir. 2013) ..........................................................12

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) ..........................................................38

*Tinnus Enters., LLC v. Telebrands Corp.*,
   846 F.3d 1190 (Fed. Cir. 2017) ..........................................................24

*TQ Delta, LLC v. Cisco Sys.*,
   942 F.3d 1352 (Fed. Cir. 2019) ..........................................................20

*TriVascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016) ..........................................................12

*Vicor Corp. v. SynQor, Inc.*,
   869 F.3d 1309 (Fed. Cir. 2017) ..................................................... 22, 29

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) ..........................................................38

**Statutes**

5 U.S.C. § 706 ............................................................................................12

**Other Authorities**

37 C.F.R. § 42.1(b) ....................................................................................28

37 C.F.R. § 42.5 .........................................................................................28

*Chisum on Patents* ...................................................................................39

## STATEMENT OF RELATED CASES

This appeal concerns IPR2021-01340.  No other appeal in or from that same proceeding was previously before this or any other appellate court.  Except for the following matter that also concerns the '402 patent, counsel is unaware of any other case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in the pending case:

> *Ocean Semiconductor LLC v. Analog Devices, Inc.*, No. 1:20-cv-12310 (D. Mass).

## JURISDICTIONAL STATEMENT

The USPTO Patent Trial and Appeal Board (the "Board") issued its Final Written Decision on February 7, 2023, under its jurisdiction to conduct IPR proceedings pursuant to 35 U.S.C. § 314.  Appellant Ocean Semiconductor, LLC ("Ocean") filed a timely notice of appeal under 35 U.S.C. §§ 141-142 and 37 C.F.R. § 90.2-90.3 on March 31, 2023.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## INTRODUCTION

In its Final Written Decision, the Board determined that all challenged claims of the '402 patent were unpatentable as obvious over the prior art combination of U.S. Patent No. 5,479,340 ("Fox") and European Patent Application No. EP 0 932 194 ("Coronel.")  The Board's determination was erroneous and should be reversed.

1

Despite the Board's finding to the contrary, Fox and Coronel are incompatible references which teach incompatible methods of monitoring semiconductor manufacturing processes. Therefore, a person of skill in the art would not have been motivated to combine them. Moreover, the motivation relied upon by the Board is uncorroborated by the references themselves.

In addition, the Board failed to consider all of the evidence when finding that a key element of claim 1 of the '402 patent, "advanced process control framework," was rendered obvious by the prior art. Deposition testimony by Applied's expert undermined its argument for the obviousness of claim, but the Board improperly considered this evidence waived.

Finally, the Board incorrectly determined that claims 6, 11 and 17 of the '402 patent were obvious by misinterpreting the disclosures of Fox and Coronel and failing to grant sufficient weight to the fact that the '402 patent met a long-felt but unmet need.

The Board's errors warrant reversal, or at least remand.

## STATEMENT OF THE ISSUES

1. Whether there is a motivation to combine Coronel and Fox.

2. Whether the Board erred in failing to consider evidence showing that Coronel does not teach or suggest the claimed "advanced process control framework" of the '402 patent.

3.      Whether Coronel and Fox teach or suggest the claimed "fault model data" or "model data" of the '402 patent.

4.      Whether the Board erred by failing to give secondary considerations of non-obviousness their due weight.

## STATEMENT OF THE CASE

## I.      BACKGROUND OF THE '402 PATENT

U.S. Patent Application No. 09/629,073, which led to the '402 patent, was filed on July 31, 2000.  Appx69.  The '402 patent generally relates to fault detection of a processing tool and control thereof using an advanced process control (APC) framework.  Appx75 at 1:1-5.  The '402 patent responded to "one problem currently encountered by the Semiconductor manufacturing industry": "the delay in reporting [] faults" occurring within semiconductor manufacturing processes, resulting in the production of "multiple faulty devices . . . which undesirably increases costs for the manufacturer and consumer."  Appx75 at 1:31-35.

The '402 patented invention overcame this drawback through a system and method of active rapid fault detection.  One of Applied's principal references, Coronel, is not a rapid response, but instead a methodical collection of data on each semiconductor wafer into a wafer history that is placed in a database. Coronel's system gathers ". . . in-situ measurements, the results of which are stored

in a database to build the step/wafer history." Appx1066 at [0033]. Further, "[i]n the database, the wafer history is the sum of all of the step reports for a determined process and a determined wafer." Appx1066 at [0040]. The wafer history includes "*all* the events that occurred to the wafer prior to the current step" of the manufacturing process. Appx1065 at [0023].

By contrast, the monitoring system disclosed in the second principal reference, Fox, combines eleven measured values into one weighted average, preferring a targeted analysis over collection of all data related to a manufacturing process "Furthermore, where a number of parameters are monitored for a given process, it is difficult to determine the dependency of one parameter to the others." Appx1055 at 1:30-32. Fox's system converts the eleven measured values to values and uses those values as inputs to a statistical algorithm, Hotelling's $T^2$ calculation. Appx1055 at 1:47-51; Appx1056 at 4:1-55. After the algorithm has been applied, "[t]he $T^2$ output is then used to determine if the plasma process is within an acceptable tolerance." Appx1055 at 1:53-54. Fox teaches that " . . . a multivariate approach to analyzing the eleven components of the RF spectra is superior … than looking at . . . all eleven components independently of one another." Appx1056 at 4:30-40.

The '402 patented method includes: 1) receiving at a first interface operational state data of a processing tool related to the manufacture of a

4

processing piece; 2) sending the state data from the first interface to a fault

detection unit; 3) determining whether a fault condition exists with the processing

tool based on the state data; and 4) performing a predetermined action on the

processing tool in response to the presence of a fault condition.  Appx75 at 1:42-

51.  The '402 patented system includes: 1) a processing tool adapted to

manufacture a processing piece, 2) a first interface coupled to the processing tool

that receives operational state data of the processing tool, and 3) a framework

adapted to perform a predetermined action on the processing tool in response to the

presence of a fault condition.  Appx75 at 1:53-63.

## II.    RELEVANT '402 PATENT CLAIMS

Relevant here, claims 1, 6, 8 11, 15 and 17 of the '402 patent address fault

detection using an advanced process control (APC) framework and read as follows:

**1**. A method comprising:

receiving at a first interface operational state data of a processing tool related
to the manufacture of a processing piece,

sending the state data from the first interface to a fault detection unit,
wherein the act of sending comprises:

sending the state data from the first interface to a data collection unit;
accumulating the state data at the data collection unit;

translating the state data from a first communications protocol to a second
communications protocol compatible with the fault detection unit; and

sending the translated state data from the data collection unit to the fault
detection unit;

determining if a fault condition exists with the processing tool based upon the state data received by the fault detection unit;

performing a predetermined action on the processing tool in response to the presence of a fault condition; and

sending an alarm signal indicative of the fault condition to an advanced process control framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit,

wherein performing a predetermined action further comprises sending a signal by the framework to the first interface reflective of the predetermined action.

**6**. The method of claim **5**, wherein comparing comprises comparing the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within acceptable operational limits.

**8**. A system comprising:

a processing tool adapted to manufacture a processing piece,

a first interface, coupled to the processing tool, the first interface adapted to receive operational State data of the processing tool related to the manufacture of the processing piece;

a fault detection unit adapted to determine if a fault condition exists with the processing tool based on said operational state data;

a framework adapted to perform a predetermined action on the processing tool in response to the presence of a fault condition;

wherein the first interface comprises a data collection unit adapted to receive and accumulate the state data as the data is received by the first interface, translate the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit, and to send the translated state data from the data collection unit to the fault detection unit;

wherein the fault detection unit is further adapted to send an alarm signal indicative of the fault condition to the framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit; and

wherein the framework is further adapted to send a control signal to the first interface reflective of the predetermined action providing that a fault condition exists.

**11**. The system of claim **10**, wherein the fault detection unit is adapted to compare the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within acceptable operational limits.

**15**. An apparatus, comprising:

an interface adapted to receive operational state data from a processing tool and to provide the operational state data;

a controller adapted to:

receive the operational state data from the interface;

determine if a fault condition exists with the processing tool based on the operational state data received from the interface; and

perform a corrective action on the processing tool in response to the presence of a fault condition,

wherein the controller is adapted to perform the predetermined action comprises the controller adapted to send a signal to the interface reflective of the predetermined action.

**17**. The apparatus of claim **15**, wherein the controller is adapted to compare at least a portion of operational data to model data to determine if a fault condition exists.

Appx78-79.

## III.   ASSERTED REFERENCES

### A.   Coronel

The first of Applied's primary references is European Patent Application No. EP 0 932 194 ("Coronel"), which teaches a "[m]ethod and system for semiconductor wafer fabrication process real-time in-situ interactive supervision." Appx1061.   Coronel teaches a system for "interactive supervision of a step performed in a tool during semiconductor wafer fabrication process."  Appx1061.

### B.   Fox

The second of Applied's primary references is U.S. Patent No. 5,479,340 to Fox et al. ("Fox"), which discloses "the use of "multivariate statistical analysis for monitoring and controlling an ongoing semiconductor process."  Appx1055 at 1:44-46.  Fox teaches inputting eleven input variables from a plasma etch process, which is one of steps in the manufacture of semiconductors, to a statistical algorithm for calculating Hotelling's $T^2$ value.  Appx1055 at 1:48-50.  Once calculated, "[t]he $T^2$ output is then used to determine if the plasma process is within an acceptable tolerance."  Appx1055 at 1:53-54.  Fox statistically evaluates the plasma process as a whole, not each measured variable.

## IV.   PROCEDURAL HISTORY

On August 3, 2021, Appellee and Petitioner in IPR2021-01340, Applied filed its Petition challenging claims 1-17 of the '402 patent as obvious over Coronel in light of Fox.  Appx230.  Following the Board's institution of *inter*

*partes* review (Appx349), Ocean filed its Patent Owner's Response, which contended that none of the challenged claims was invalid in light of Applied's asserted references. Appx401-409. On July 27, 2022, Applied filed its Amended Reply. Appx518.

A dispute over the scope of evidence arose during the proceeding. Specifically, the parties disputed whether Ocean should be permitted to depose Applied's expert Dr. Miltiadis Hatalis based on citations to his testimony in Applied's Reply. Appx537-538. During a teleconference with the Applied and Ocean, on August 24, 2022, the Board permitted Ocean to depose Dr. Hatalis. Appx537-538. On September 22, 2022, Ocean filed its Amended Sur-Reply. Appx578-602. On September 30, 2022, Applied filed a Motion to Strike seeking *inter alia* to strike portions of Patent-Owner's Amended Sur-Reply that relied on Dr. Hatalis' deposition testimony (Appx618-620; Appx622), to which Ocean responded on October 14, 2020 (Appx651-653; Appx660).

The Board held oral argument on November 15, 2022. Appx794. On February 7, 2023, the Board issued its Final Written Decision, determining that all claims of the '402 were unpatentable under 35 U.S.C. § 103. Appx1. The Board also determined that Applied's motion to strike with respect to Dr. Hatalis' deposition was moot in light of its determination that Ocean had waived those arguments. Appx17-20; Appx63-64.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The Board's decision was erroneous for at least four reasons.

In its Final Written Decision, the Board determined that all challenged claims of the '402 patent were unpatentable as obvious over the prior art combination of Fox and Coronel. The Board's determination was erroneous and should be reversed.

*First*, the Board's determination that a motivation to combine Applied's principal references Fox and Coronel, was not based on substantial evidence but instead relied solely on the conclusory statements of Applied's expert Dr. Miltiadis Hatalis, which were uncorroborated by any persuasive evidence from either the primary or secondary references asserted by Applied. Moreover, the basic incompatibility between Fox, which teaches reduction of complex data to a single value, and Coronel, which teaches the collection of ***all*** relevant data, meant that a person of ordinary skill in the art ("POSA" or "POSITA") never would have looked to the system of Fox to improve upon Coronel. Reliance on Fox, averaging of data, would have destroyed the fundamental teaching of Coronel, detailed record keeping of all data.

*Second*, the Board abused its discretion by determining that Ocean waived any argument based on the deposition of Applied's expert Dr. Hatalis, which took

10

place after Applied had filed its Reply. By failing to consider this additional evidence, the Board permitted Applied to evade its burden to show that the prior art taught all of the components of the claimed "advanced process control framework" and found claim 1 to be obvious despite substantial evidence to the contrary.

*Third*, the Board erred by determining that the combination of Fox and Coronel teach the "fault model data" of claims 6 and 11 and the "model data" of claim 17. By misconstruing Coronel's modification of process parameters and Fox's $T^2$ calculation as models, and ignoring significant evidence to the contrary, the Board incorrectly found these claims to be obvious.

*Fourth*, by recognizing that claims 6, 11 and 17 met a long-felt but unmet need yet failing to grant that factor appropriate weight in its obviousness analysis, the Board also misapplied objective considerations of nonobviousness in its analysis. The Board's weighting of this factor was based on a misreading of evidence showing that the need for sensor based process control had not been met prior to the '402 patented invention.

For the above reasons, the Board's Decision should be vacated or at least remanded.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the Board's legal conclusions *de novo*, and its factual findings for substantial evidence.  *Id*.; *see* 5 U.S.C. § 706(2); *see also Rambus Inc. v. Rea*, 731 F.3d 1248, 1251 (Fed. Cir. 2013); *Ariosa Diagnostics v. Verinata Health, Inc*., 805 F.3d 1359, 1364 (Fed. Cir. 2015); *Chemours Co. FC, LLC v. Daikin Indus*., 4 F.4th 1370, 1374 (Fed. Cir. 2021).  Substantial evidence requires more than a "mere scintilla" and must be enough such that a reasonable mind could accept the evidence as adequate to support the conclusion.  *Chemours*, 4 F.4th at 1374 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Board's "ultimate construction," including analysis of any intrinsic evidence, is reviewed *de novo*.  *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1061 (Fed. Cir. 2016) (internal quotation marks omitted). A decision based on legal error constitutes an abuse of discretion.  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) (finding that a lower court abuses its discretion if it is based on an erroneous view of the law); *see also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1366 (Fed. Cir. 2017) (citing *Highmark Inc. v. Allcare Health Mgt. Sys., Inc.*, 572 U.S. 559, 563 (2014)).  Further, the Board's evidentiary rulings are

12

reviewed "for abuse of discretion, which may be found if the Board violated governing law." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1078 (Fed. Cir. 2015).

## II. THE BOARD INCORRECTLY DETERMINED THAT THERE WAS A MOTIVATION TO COMBINE CORONEL AND FOX

The Board's conclusion that a motivation existed to combine the disclosures of Coronel and Fox was unreasonable and contrary to the facts as presented to the Board. In reaching its conclusion, the Board ignored evidence from Coronel and Fox that the two patents teach away from their combination and based its determination solely on the testimony of Applied's expert Dr. Hatalis, in contravention of established precedent.

### A. Dr. Hatalis' Testimony Is Insufficient Proof of a Motivation to Combine

The Board found that a motivation to combine Coronel and Fox existed solely on the basis of Dr. Hatalis' declaration, which is an insufficient basis for proving the obviousness of the claims of the '402 patent.

In its Final Written Decision, the Board stated that:

[W]e agree with Petitioner and Dr. Hatalis that "[a] POSA would have recognized that applying the teachings of Fox to the system of Coronel, . . . would have promoted the desired objective of increasing process yields by combining fault detection based on multivariate analysis of tool state data with fault detection based on data received from the monitoring equipment of Coronel."

13

Appx17 (quoting Appx881 at ¶ 74).  In short, the Board found a motivation to combine *only two specific features* of the prior art: the multivariate fault detection of Fox with Coronel's ability to receive data from the equipment that monitors a semiconductor manufacturing process.

Dr. Hatalis opined that the motivation to combine the prior art was directed at "combining fault detection based on multivariate analysis of tool state data with fault detection based on data received from the monitoring equipment."  Appx881 at ¶ 74.  That, however, is not the claimed invention.  Such a motivation cannot be proper basis for a § 103 analysis.  In relying on Dr. Hatalis, the Board committed clear error.

According to the Petition, Coronel is lacking numerous components of the claimed combination: "a fault detection unit" (Appx208-209), a "data collection unit" and "accumulating state data" (Appx209), "translating" (Appx210-211) and "sending state data" (Appx211-213) and "performing a predetermined action" (Appx214-215).  However, Dr. Hatalis never states any motivation for adding these specific claimed components and steps to Coronel, which confirms that the motivation he identifies is limited to combining two methods of fault detection. The only motivation cited by Applied is to improve Coronel by adding $T^2$ values from Fox.  Appx204.  That says nothing about why a person of skill in the art

14

would have been motivated to improve on all of the other components that are not disclosed in Coronel that are not related to fault detection specifically.

Moreover, a motivation to improve a reference is not the proper test; rather, a motivation to achieve the claimed invention, i.e. the specific recited components, is required. $T^2$ data may be an improvement of Coronel,[1] but modification of Coronel based on hindsight is not a motivation to combine the recited elements. The inquiry is not whether a relevant artisan would combine a first reference's feature with a second reference's feature to meet requirements of the first reference that are not requirements of the claims at issue.

Without relying on any specific teachings from either Fox or Coronel, Dr. Hatalis argued that "applying the methods disclosed in Fox to the system of Coronel would have been straightforward and an application of known techniques to improve a comparable system in the same way." Appx881 at ¶ 75. Specifically, Dr. Hatalis argued that applying Hotelling's $T^2$ algorithm taught by Fox would have improved the system of Coronel. Appx882-883 at ¶ 78.

That is far too narrow a motivation to combine those two references. Even if Dr. Hatalis were correct that Coronel teaches fault detection, improving that fault detection through Fox's $T^2$ algorithm would not achieve the whole claimed system

---

[1] As discussed *infra* pp. 21-24, Coronel is degraded, not improved, by conversion of detailed data to an aggregate $T^2$ value.

of the '402 patent, including the translation, accumulation and storing of data, sending of data, and performance of a predetermined action described above. Improving the system of one of the prior art references by combination with the other reference is not the test for obviousness. The motivation must be to achieve the specific combination to achieve the claimed invention:

> Obviousness is an issue of law decided based on numerous factual findings, including the scope and content of the prior art, the level of ordinary skill, and whether a relevant artisan would have had a motivation to combine references *in the way required to achieve the claimed invention.*[2]

*Axonics, Inc., v. Medtronic, Inc.*, 2022-1451, 2022-1452, 2023 U.S. App. LEXIS 17231, at *13 (Fed. Cir. July 10, 2023) (citing *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1331 (Fed. Cir. 2019) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966))); *see also PAR Pharmaceutical, Inc. v. TWI Pharmaceuticals, Inc.*, 773 F.3d 1186, 1196–97 (Fed. Cir. 2014).

Interpreting the motivation to combine narrowly to refer only to specific features of a claimed invention such as fault detection constitutes error:

> We conclude that this rationale is doubly infected by error. First, . . . the Board committed a fundamental legal error in confining the motivation inquiry to whether a motivation would exist to make the proposed combination for use in the Young-specific trigeminal-nerve context—*to which the Medtronic patents are not limited.*

---

[2] Unless otherwise noted, all emphasis in this Brief has been added.

*Axonics*, 2023 U.S. App. LEXIS 17231 at *14.  Improving only Coronel's fault

detection through the addition of Hotelling's T² algorithm is exactly the type of

overly-narrow motivation prohibited by *Axonics*.  By omitting the many other

components of the claimed '402 invention which were not disclosed by Coronel—

including data collection, translation, data collection and accumulation, sending

state data, and performing a predetermined action—from its motivation to

combine, the Board committed error.

The other teachings from Fox, Coronel and secondary references on which

the Board relies to prop up its motivation to combine are insufficient.  For

example, the Board points to a reference disclosing the use of ProcessWORKS

software to undertake "advanced multivariate analysis based on trace data" in the

context of fault detection and classification (FDC) as supporting Dr. Hatalis'

opinion.  Appx18.  That statement, however, would not have motivated a POSITA

to combine Coronel and Fox, as neither reference teaches the use of the mentioned

ProcessWORKS software or explicitly invokes FDC.  *See Indivior Inc. v. Dr.*

*Reddy's Labs., S.A.*, 930 F.3d 1325, 1346 (Fed. Cir. 2019) (upholding a district

court's finding of an absence of a motivation to combine "based on a teaching that

was not emphasized in any meaningful way from a reference in a different field

addressing a different problem.").

The Board additionally relies on Fox's disclosure that "[t]he use of the Hotelling's T² multivariate analysis is a statistical method well known in the prior art," (Appx18 (quoting Appx1056 at 4:7-9)), but this teaching also provides no reason to combine Fox with Coronel to achieve the claimed invention which does not claim Hotelling's multivariate analysis.

Finally, the Board's reliance on secondary aspects of Fox and Coronel to show their compatibility is not a motivation to combine. Appx18. There are multiple phases to semiconductor manufacturing, in which a semiconductor wafer undergoes different processes, including deposition, etch, and lithography. However, contrary to the Board's determination (Appx20), the fact that both Fox and Coronel happen to describe their systems in the context of the same plasma etch process would not have motivated a POSITA to combine those references. That coincidence is of secondary relevance at best, since both Fox and Coronel are concerned with monitoring and analyzing a manufacturing process, not with the content and goals of the process itself.[3] For the same reason, a previous

_____

[3] Coronel specifically notes that its method and system is not limited to plasma etching: "The description which follows will be made by reference to a multi-chamber RIE tool such as the AME 5000 manufactured by Applied Materials, Santa Clara, CA, USA, that is adapted to perform a sequence of steps for etching different materials at the surface of the wafer. However, other tools such as deposition equipments and the like may be envisioned as well." Appx1062 at [0005].

implementation of multivariate analysis on the same plasma etch tool (AME 5000) identified in Coronel does not provide a reason to combine Coronel with Fox. Appx18. There is nothing in either Fox or Coronel which suggests that the particular tool being analyzed is material to either Fox's multivariate analysis or Coronel's interactive supervision of a process step. It is entirely ancillary to the type of analysis disclosed in either reference.

Whether taken individually or as a whole, these disparate teachings do not meet the requirements for a motivation to combine, as none points to a specific teaching suggesting that the system of Coronel *should be* combined with that of Fox to achieve the claimed invention. *See In re NuVasive, Inc.*, 842 F.3d 1376, 1381-82 (Fed. Cir. 2016) ("Although we review this factual finding for substantial evidence, '[t]he factual inquiry whether to combine references must be thorough and searching,' and '[t]he need for specificity pervades [our] authority' on the PTAB's findings on motivation to combine.").

Moreover, the Board's Final Written Decision was in error to the extent it relies on Dr. Hatalis's opinion regarding the purported enhancement of Coronel's system by using Fox's $T^2$ algorithm:

> A POSA would have, therefore, recognized that employing the $T^2$ values described in Fox would enhance the ability of the system and method of Coronel to determine how variations in one aspect during processing could impact others and handle any potential issues that could arise from the system handling the vast amount of data received from various tools in the system . . . .

19

Appx883 at ¶ 78.   That conclusory statement is also without a basis in either

Coronel or Fox, and therefore does not support a motivation to combine.  *See*

*Acoustic Tech., Inc. v. Itron Networked Sols., Inc*., 949 F.3d 1366, 1375 (Fed. Cir.

2020) ("Acoustic is correct that conclusory expert testimony and attorney

argument cannot constitute substantial evidence of a motivation to combine."); *see*

*also TQ Delta, LLC v. Cisco Sys*., 942 F.3d 1352, 1358-63 (Fed. Cir. 2019) (citing

cases).

Similarly, the Board's reliance on Dr. Hatalis's opinion that "[a] POSA

would have recognized that applying the teachings of Fox to the system of Coronel

. . . would have promoted the desired objective of increasing process yields . . ."

was erroneous.  Appx17 (quoting Appx881 at ¶ 74).   While Applied presented

evidence indicating that increased process yields were desirable, that is an

insufficient motivation to combine Fox and Coronel *specifically*, particularly in the

absence of any statement in the references themselves indicating that such a

combination would produce the desired result.  By concentrating on perceived

benefits to a combination that would produce the method of the '402 patent,

Applied indulges in hindsight bias and does not corroborate its contention with any

disclosures from either Fox or Coronel.  *See ActiveVideo Networks, Inc. v. Verizon*

*Communs., Inc*., 694 F.3d 1312, 1327-28 (Fed. Cir. 2012) (finding an absence of

motivation to combine where "testimony is generic . . . [and] also fails to explain

why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does.").

Finally, the Board erred in relying on Dr. Hatalis' opinion based on the fact that it "remains unrebutted." Appx20. It was Applied's burden to show a motivation to combine that met the standards set forth by this Court, and Ocean was not required to produce rebuttal evidence to contradict the insufficient evidence presented by Applied. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1377 (Fed. Cir. 2016) ("We agree with Magnum that the Board improperly shifted the burden to it, as the patentee, to prove nonobviousness.") Given that Dr. Hatalis' opinion was uncorroborated, and despite the insufficient and largely irrelevant evidence to support it presented by Applied and adopted by the Board, that opinion cannot sustain Applied's burden to prove a motivation to combine, even when not rebutted by another expert.

### B.    Coronel and Fox Are Incompatible

The Board's finding of a motivation to combine was also unreasonable given that the asserted combination of Coronel and Fox would not have been attempted due to the incompatibility of the two references. Appx431; Appx811-815. Applied's argument that "[a] POSA developing a system and method for real-time in-situ fault detection, as described in Coronel, would have been motivated to look at other real-time in-situ fault detection systems and methods to identify useful

21

methods for handling 'the huge quantity of data' of tool state data . . . " (Appx200) ignores the manifest incompatibility of Coronel's system with the teachings of Fox. *See Vicor Corp. v. SynQor, Inc*., 869 F.3d 1309, 1324 (Fed. Cir. 2017) ("The Board's findings that an artisan would not combine Steigerwald and Cobos because of their operating frequency incompatibilities were essential to the judgments holding the '290 and '702 patents not obvious.").

It is precisely the dichotomy between "handling the huge quantity of data" by minimizing the data, as taught by Fox, and "exploiting" the recordation of detailed big data sets for improved performance, as taught by Coronel, that makes the two references at odds due to their competing goals. Coronel desires recordation of all possible collatable data: "In the database, the wafer history is the sum of all of the step reports for a determined process and a determined wafer." Appx1066 at [0040]. Consequently, Coronel would not be "seeking methods for applying multivariate analysis" (Appx880 at ¶ 73) and would not look to Fox for performance enhancement, because Fox discards the details and aggregates the data into a single value. Fox teaches that "[e]leven components of the RF spectra are measured and converted as input variables to the T2 calculation. A software routine provides the necessary calculations to solve for Hotelling's T2 value." Appx1055 at 1:47-51. Nothing in Coronel would suggest to a POSITA that Fox's

multivariate analysis would be an appropriate means of exploiting the data sets produced by Coronel's system.

One skilled in the art would not be motivated to combine a corner cutting patent, Fox, with a detail oriented patent, Coronel, as such a combination would destroy the purpose of each invention. Such a combination, if made, would be an unworkable compromise gathering too much data for rapid response and averaging out too many values for meaningful subsequent full batch analysis based upon detailed collection for long term quality control. Such a combination would certainly not render the claimed '402 invention obvious.

By simply taking at face value Dr. Hatalis' uncorroborated opinion that a POSITA seeking to improve upon Coronel's system would have looked to Fox's use of Hotelling's T² algorithm, the Board failed to recognize the incompatibility of Coronel, which relies on a wafer history that is "the sum of all the step reports for a determined process and a determined wafer" (Appx1066 at [0040]) and Fox, which reduces eleven detected values to a single number (Appx1055 at 1:47-55; Appx1056 at 4:50-56). *See also* Appx708-709 ("Coronel collects and archives details on each wafer processed . . . Fox reduces eleven independent values to a single aggregate number.").

No reasonable factfinder would have found a motivation to combine these disparate references. *See Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190,

1207 (Fed. Cir. 2017) ("Therefore, under a plain error review, we cannot say that the district court committed a clear or obvious error when it found insufficient motivation to combine these disparate references."); *In re Natural Alternatives, LLC*, 659 Fed. Appx. 608, 612-14 (Fed. Cir. 2016) (finding that the Board "failed to set forth a prima facie case for a motivation to combine" based on what appellant argued were "disparate references").

## III.   THE BOARD ERRED IN DETERMINING THE "ADVANCED PROCESS CONTROL FRAMEWORK" OF CLAIM 1 WAS TAUGHT BY CORONEL

### A.   The Board Failed to Consider All of the Evidence Regarding the "Advanced Process Control Framework"

#### 1.   Dr. Hatalis Changed His Definition of APC Framework

In determining that "the combination of Coronel and Fox teach sending an alarm signal to an advanced process control framework," (Appx37) the Board deliberately overlooked key evidence and ignored the contradictory testimony of Applied's expert Dr. Hatalis.  The Board's finding regarding the "advanced process framework" limitation of claim 1 of the '402 patent was thus based on a partial and incomplete review of the evidence of record in the *inter partes* review proceeding, resulting in an erroneous conclusion.[4]  The '402 patented invention is a

---

[4] As noted in Ocean's Amended Sur-reply, the absence of an APC framework would also be fatal to Petitioner's case for the nonobviousness of independent claims 8 and 15.  Appx585.  As stated in Ocean's Patent Owner's Response, claims 2, 3, 4, 5, 7, 9, 12, 13, 14 and 16 of the '402 patent are not rendered obvious for the same reasons that independent claims 1, 8 and 15 are not rendered obvious.

"method and apparatus for providing fault detection in an Advanced Process Control framework," making this limitation key not only to claim 1, but to the '402 patent as a whole.  Appx69 at Abstract.

The Board relied on Dr. Hatalis's argument that a "portion of the hardware and software of the computer in Coronel (e.g., a program that resides in a portion of the computer memory) would also act as an APC that receives an alarm signal from the supervisor upon the supervisor detecting a fault and then acts upon receiving it."  Appx37-38 (quoting Appx895-896).  In his initial declaration, Dr. Hatalis identified only the Coronel computer's ability to bypass process steps or stop a tool as characteristic of an APC framework.  Appx871.

Subsequently, at deposition, Dr. Hatalis expanded on his definition of an APC framework, identifying numerous additional "software" features of an APC framework including "fault detection or diagnosis of maintenance" (Appx3160), a controller (*id.*), and a component that modifies tool settings (*id.*). Dr. Hatalis also described the APC framework as "enabl[ing] run to run control . . . [and] detect[ing] failures or faults of the equipment and provid[ing] alarms and dictat[ing] actions." Appx3161. Dr. Hatalis also testified that an APC includes interfaces that receive and send signals, which are not software components. *Id.*

---

Appx432-433.  The Board determined that for both claims 8 and 15 "[f]or the reasons discussed with respect to claim 1, we do not find these arguments persuasive."  (Appx49.)

None of these components had been previously identified by Dr. Hatalis or Applied as part of an advanced process control framework, which cast further doubt on whether the advanced process control framework was obvious in view of Fox and Coronel.  Ocean argued in its Sur-reply, which was the only paper in which it could have cited this deposition, that based on Dr. Hatalis' statements, Applied had failed to show that either Fox or Coronel disclosed an advanced process control framework of claim 1.  Appx586-589.

### 2. The Board Erred in Determining that Ocean Had Waived Argument Based on Dr. Hatalis' Deposition

In its Sur-reply, Ocean identified the elements which Dr. Hatalis had identified in his testimony and which Applied had failed to identify in Coronel or Fox.  Appx587.  Ocean pointed out that,

> [f]or example, while Petitioner includes a discussion of "run-to-run control" in the "Background of Semiconductor Manufacturing" section of the Petition (Paper 1 at 22-23), and in its Reply presents a claim construction for APC framework that includes "run-to-run control" (Reply at 4 n. 2), ***nowhere*** does Petitioner actually argue that run-to-run control is integrated into or a function of the computer 12 of Coronel or that Coronel discloses run-to-run control as integrated function of Coronel's computer.

Appx587.  Ocean also identified other software components that Dr. Hatalis had identified as being part of an APC framework, such as "fault detection or diagnosis of maintenance" but which Applied had never alleged were executed by Coronel's computer. *Id*.

26

Rather than consider the issues raised by Dr. Hatalis' deposition testimony on the merits, the Board "[found] that this argument was waived because it was not included in Patent Owner's response." Appx41. This makes no sense, as the Board had specifically permitted Ocean to take Dr. Hatalis' deposition *after* the filing of Applied's Reply. Appx537-541. There was no reason to take Dr. Hatalis' testimony other than to probe aspects of his prior declaration, used in Applied's Reply to which Ocean was responding, and Ocean had no way of knowing in advance the response that its questions would elicit from Dr. Hatalis. This evidence was properly raised in the Sur-reply, which was the only opportunity that Ocean had to address a significant, last-minute change in the position of Applied's expert.

This Court has recognized that it is proper for a patent owner to both seek to depose an expert following a Reply and to respond to the new testimony in a sur-reply:

> Thus, if the petitioner submits a new expert declaration with its Reply, the patent owner can respond in multiple ways. It can cross-examine the expert and move to file observations on the cross-examination. It can move to exclude the declaration. It can dispute the substance of the declaration at oral hearing before the Board. It can move for permission to submit a surreply responding to the declaration's contents. And it can request that the Board waive or suspend a regulation that the patent owner believes impairs its opportunity to respond to the declaration. The options are not mutually exclusive.

*Berk-Tek*, 805 F.3d at 1081; *see also* 37 C.F.R. § 42.1(b) ("This part shall be construed to secure the just, speedy, and inexpensive resolution of every proceeding."); 37 C.F.R. § 42.5(c)(3) ("A late action will be excused on a showing of good cause or upon a Board decision that consideration on the merits would be in the interests of justice.")  Denying Ocean the opportunity to bring evidence from Dr. Hatalis's deposition after permitting that deposition was an abuse of the Board's discretion and not in the interests of justice.

The Board also declined to consider this argument "to the extent [it] is grounded in claim construction."  Appx42.  While it is true that neither Applied nor Ocean proposed construction of the term "advanced process control framework," the issue of Dr. Hatalis's testimony was not one of claim construction.  Rather, it was Applied's burden to prove the obviousness from the point of view of one skilled in the art at the time of invention, and as Applied had identified features of an APC that it contended would have been known to a POSITA, the Board should have determined whether those features were actually present in Fox or Coronel.

Finally, the Board's reasoning that it "[would] not resolve these issues on an incomplete record" (Appx43) was also erroneous.  Dr. Hatalis's additional testimony came during a deposition that the Board had ordered, and there is no reason why any additional evidence should have been ignored.  Applied opted not

28

to seek the Board's permission to address the additional testimony proffered by its own expert following the sur-reply or during oral argument, consistent with its view that further argument on the topic should be foreclosed on procedural grounds.  Appx618-620.  Hence, there is no reason why the record should be considered incomplete as to a POSITA's understanding of the components of an APC framework.  Both parties' experts have opined on the "advanced process control framework" and the Board should have considered all relevant testimony. *See Vicor*, 869 F.3d at 1324 ("While the Board may have indirectly acknowledged these arguments in part . . . we cannot conclude with any confidence that it met its requirement to address all grounds for proposed rejection under the APA."); *Intel Corp. v. VLSI Tech. LLC*, 858 Fed. Appx. 349, 354 (Fed. Cir. 2021) (finding the Board erred when it failed to consider an argument it considered "newly raised").

### B.    Applied Did Not Meet Its Burden to Show That All of the Limitations of Claim 1 Were Taught by Fox and Coronel

In light of Dr. Hatalis's additional testimony on the "advanced process control framework" limitation of the claims of the '402 patent, it was unreasonable for the Board to conclude that Applied had met its burden and that the claims of the '402 patent were rendered obvious by the combination of Fox and Coronel.

The Board should have recognized that Dr. Hatalis' revision of his initial definition of "advanced process control framework" was material to Applied's case for the unpatentability of the '402 patent.  In its Final Written Decision, the Board

acknowledged the centrality of this claim element when it stated that "the '402 patent relates to 'fault detection and control of a processing tool using an *Advanced Process Control (APC) framework*' in the field of semiconductor fabrication." (Appx4.)

By adding new features such as run-to-run control and diagnosis of maintenance to his description of an advanced process control framework from the point of view of a POSITA, Dr. Hatalis complicated the record, in the process undermining Applied's case for the obviousness of the challenged claims. At no point did Dr. Hatalis identify *where* these features of an advanced process control framework were present in the specific component of Coronel, the computer 12, which he argued "acts as an APC framework." Appx870-871 at ¶ 56. Nor did he explain how these additional features would have been obvious in light of the disclosures of either Fox or Coronel.

Ocean also identified other ways in which Dr. Hatalis's statements at deposition undermined Applied's case for obviousness. Dr. Hatalis attributed certain features to an APC framework that Coronel identifies in other components of its system, casting further doubt on whether the computer 12 could in fact "act[] correspond to the claimed "advanced process control framework. Appx586-589. For example, Dr. Hatalis argued that an APC framework comprised "fault detection or diagnosis of maintenance" for "detect[ing] failures or faults of the

equipment and provid[ing] alarms and dictat[ing] actions." Appx587. Coronel, by contrast, teaches that the supervisor 35, not the computer 12, is responsible for emitting alert codes when a deviation is detected and analyzing signals, such as those "related to the occurrence of a possible general failure (e.g. a RF shut-down)." Appx588 (quoting Appx1071 at [0057]).

In sum, had the Board fully considered Dr. Hatalis' belated disclosure of additional elements such as run-to-run control and diagnosis of maintenance in an APC framework of the '402 patent, it could not have concluded that Applied had met its burden to prove the obviousness of claims 1, 8 and 15 (as well as the claims that depend from them) by a preponderance of the evidence.

## IV.    NO REASONABLE FACTFINDER COULD FIND THAT CLAIMS 6, 11 AND 17 WERE OBVIOUS IN LIGHT OF CORONEL AND FOX

### A.    Neither Fox nor Coronel Teaches or Suggests the "Fault Model Data" of Claims 6 and 11 or the "Model Data" Of Claim 17

Claims 6 and 11 of the '402 patent recite "fault model data," while claim 17 recites "model data." Claims 6 recites "comparing the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within acceptable operational limits" as an element of its method, where claims 11 and 17 recite a similar comparison as part of system and apparatus claims, respectively.

The Board's finding that each of these claims were rendered obvious by the combination of Fox and Coronel was not based on substantial evidence.  Notably, as the Board recognized in its FWD, there is no express teaching of a model in either Coronel or Fox, let alone of a fault model.  Appx55.  Instead, the Board found that the "data used in the comparisons in Coronel and Fox *is similar* to what is described and claimed in the '402 patent."  Appx56.  This was, in the Board's view, sufficient to find claims 6, 11 and 17 obvious, as "the law does not require *ipsissimis ver[b]is* disclosure."  Appx55 (citing *In re Bond*, 910 F.2d 831, 832-33 (Fed. Cir. 1990)).

The Board was wrong.  The absence of the word "model" from either reference is indicative of the substantial dissimilarity between their disclosures and the "fault model data" of the '402 patent.  Following Applied's lead, the Board simply concludes that the methods of both references represent "models" without considering the significant differences between them and the "fault model data" of the '402 patent.

In reaching that conclusion, the Board mischaracterizes Ocean's argument that Fox's method lacks sufficient "granularity" as a simple disagreement over the level of complexity required by the claim language.  Appx54.  In fact, Ocean argued that Fox's use of Hotelling's $T^2$ algorithm provides a single value which informs whether a given semiconductor wafer is within an acceptable tolerance or

outside of it, but does not provide any of the necessary characteristics to *compare* that wafer to subsequent wafers and determine whether they are inside or outside of acceptable limits. Appx817-818; *see also* Appx1058 at 7:7-13 ("If the T value is within the acceptable UCL/LCL range for the given ongoing process, the controller 22 allows the process to continue. If the T value is not within the acceptable UCL/LCL tolerance, an out of tolerance signal is generated.").  The T value is a simple yes/no indicator that is stripped of any of the necessary context for a *comparison* with later wafers that is inherent in "fault model data."  Moreover, Fox does not teach parameters that can be sent to an APC, as required by the claims. Thus, the question is not simply one of Fox's lack of granularity but of its lack of workability within a fault detection scheme of the kind taught by the '402 patent. *See* Appx816-819.  By failing to consider that argument, the Board incorrectly determined that Fox also disclosed "fault model data."

Similarly, Coronel's teaching of modifying process parameters relates to whether or not an individual wafer should be reworked and whether a chip should be stopped, but does not teach the creation of a model or the creation of data that can be sent to an APC, which is fatal to Applied's obviousness case.  Appx816. Moreover, Coronel points at best to a statistical control method, predictive maintenance, that Ocean's expert has testified is distinct from a model-based approach (Appx3107), a point that Applied never rebutted.  These aspects of

Coronel, each of which was identified by Ocean, demonstrate the absence of "fault model data" from the reference.  Based on this evidence, it is clear that Applied cannot meet its burden to show the obviousness of these claims.

The Board also erred by ignoring portions of the '402 specification which would inform a POSITA regarding the scope of "fault model data."  Appx52-53. In the '402 patent, fault detection relies on model reference files (MRFs) for the wafer being processed which are compared to fault model data.  From this comparison, the fault detection system produces tool health data which is sent to the APC framework.  While these portions of the specification are exemplary, as Ocean acknowledged (Appx596), they are nonetheless illustrative of how a POSITA would understand "fault model data" or "model data" and whether either Coronel or Fox, alone or in combination, suggest these elements.  The absence of any teaching in either Fox or Coronel of tool health data underlines a key difference from the '402 patent, as it is the tool health data in this exemplary portion of the '402 specification that is sent to the advanced process control framework.[5]  Again, neither Fox nor Coronel teaches or suggests sending any data,

---

[5] Significantly, the Board also ignored evidence that a POSITA would have understood tool or machine "health" as the result of machine and process modeling. *See* Appx3016; Appx3132.

let alone the result of a comparison, to an advanced process control framework, as is required by each of claims 6, 11, and 17.

### B.    The Board Did Not Give Proper Weight to Objective Indicia of Nonobviousness

Despite recognizing the existence of a long-felt need for sensor based process control which was resolved by the '402 patent (Appx59), the Board did not give this factor sufficient weight in its obviousness analysis.  The Board's granting of only "modest weight" to objective indicia of non-obviousness was contrary to the evidence presented by Ocean in the IPR.

As stated in the Final Written Decision, The Board's determination was based on the examination of three factors: 1) whether the need was persistent; 2) whether it had been satisfied by another before Ocean's invention, and 3) whether the invention itself satisfied the long-felt need.  However, the Board's determination that the evidence presented by Ocean was "diminish[ed]" (Appx59) related solely to the second factor, whether or not the need had been satisfied by another prior to the '402 patented invention.

While the Board correctly identified the support for this factor in Ex. 2043 "Metrology Needs for the Semiconductor Industry Over the Next Decade," its selective quotation of this article, based on arguments that were never presented by Applied and to which Ocean had no opportunity to respond, was erroneous.  *See In re Magnum Oil*, 829 F.3d at 1381 ("[W]e find no support for the PTO's position

35

that the Board is free to adopt arguments on behalf of petitioners that could have

been, but were not, raised by the petitioner during an IPR.").

Specifically, the Board states that it was unable "to determine whether there

are other aspects of the protocol and standardization activities that the industry has

yet to comply with" (Appx59) based on the following passage from Ex. 2043:

> Presently, the conversion to 300 turn wafer capable tools is driving much of the factory control protocol and standardization activities for Advanced Process Control (APC)/Advanced Equipment Control (AEC). This community's assessment is that no sensor-based process control capability is fully compliant with these protocols and standards.

Appx58 (quoting Appx3148).

However, the full context of the quotation makes it clear that the "protocols

and standards" referred to are "CIM data transfer protocols and standards":

> The goal of sensor-based process control is to provide real time fault detection and model based operation of process tools. Achieving the full potential of this approach requires both hardware (process tool controllers) and software that are fully integrated into the factory control CIM system. In other words, the sub-system that receives sensor data and controls the process tool must comply with factory CIM data transfer protocols and standards.

Appx3148.

Read in its entirety, the relevant passage of the article indicates that: 1)

compliance with *CIM protocols and standards* was necessary for provision of "real

time fault detection and model based operation of process tools"; and 2) at the time

Exhibit 2043 was published, no factory control equipment was available that

complied with those CIM protocols and standards.  Appx3148.  That is more than

sufficient to show that no other person had met the industry's long-felt need at the time of the invention of the '402 patented method.  The concerns expressed by the Board were unfounded because this evidence leaves no doubt as to what protocols and standards were required to meet the long felt need for sensor-based process control.  This error led the Board to misapply the factors related to objective indicia of nonobviousness.

As the Board recognized, Mr. Humphrey's testimony regarding secondary considerations was unrebutted.  Appx59.  Thus, but for the Board's misreading of Ex. 2043, there would be no reason to grant "modest weight" to the fact that the longstanding "goal of sensor based process control" including "real time fault detection and model based operation of process tools" (Appx3148) was met by the '402 patent.

Granted its proper weight, the longstanding need for a model-based system of real time fault detention would have been a sufficient ground for determining that claims 6, 11 and 17 of the '402 patent are not obvious in light of Fox and Coronel.  As this Court has repeatedly emphasized:

> Evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decision-maker remains in doubt after reviewing the art.

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983); *In re Piasecki*, 745 F.2d 1468 (Fed. Cir. 1984) (same); *Adapt Pharma Operations Ltd v. Teva Pharms. USA, Inc.*, 25 F.4th 1354, 1383 (Fed. Cir. 2022) (same, citing *Stratoflex*).  In this case, the Board's finding that claims of the '402 patent met a long-felt but unmet need was more than sufficient to overcome Applied's argument that those claims were obvious, with all of its weaknesses identified above.

Moreover, numerous courts have recognized the special probative value of a long-felt but unmet need among the secondary considerations of nonobviousness. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1332 (Fed. Cir. 2016) ("Evidence of a long felt but unresolved need tends to show non-obviousness because it is reasonable to infer that the need would have not persisted had the solution been obvious."); *Ecolochem, Inc. v. Southern Cal. Edison Co*, 227 F.3d 1361, 1380 (Fed. Cir. 2000) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)) ("The factors specifically mentioned in *Graham*, and those that we give the most weight to in the instant case, are the commercial success of the invention, long-felt but unsolved needs, and failure of others to invent."); *In re Mahurkar Patent Litigation*, 831 F. Supp. 1354, 1377–78 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995) ("The existence of an enduring, unmet need is strong evidence that the invention is novel, not obvious, and not anticipated."); *see also Chisum on Patents*

§ 5.05[1] ("Numerous decisions rely upon such evidence as probative of patentability.").

Thus, even if the Board overlooked the many gaps in Fox and Coronel with respect to claims 6, 11 and 17 (which is an independent basis for the nonobviousness of those claims), the fact that the '402 patent met a long-felt but unsolved need for real-time model-based process control shows that claims 6, 11 and 17 are not obvious in light of Fox and Coronel. By recognizing this factor but failing to give it sufficient weight, the Board's determination of obviousness was arbitrary and capricious.

## V.    CONCLUSION

For the foregoing reasons, the Court should reverse or vacate and remand the Board's Final Written Decision.

July 21, 2023                                  Respectfully submitted,

                                              DEVLIN LAW FIRM LLC

                                              */s/ Joseph J. Zito*
                                              Joseph J. Zito
                                              1526 Gilpin Avenue
                                              Wilmington, DE 19806
                                              (302) 449-9010
                                              jzito@devlinlawfirm.com

                                              *Attorney for Appellant*
                                              *Ocean Semiconductor LLC*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Date | Description | Appx Nos. |
|------|-------------|-----------|
| 2/7/2022 | Final Written Decision | Appx1 |
| | US Patent No. 6,725,402 | Appx69 |

Trials@uspto.gov                                    Paper 52
571-272-7822                              Date: February 7, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLIED MATERIALS, INC.,
Petitioner,

v.

OCEAN SEMICONDUCTOR LLC,
Patent Owner.

———————

IPR2021-01340
Patent 6,725,402 B1

———————

Before MIRIAM L. QUINN, JOHN D. HAMANN, and
DAVID COTTA, *Administrative Patent Judges*.

COTTA, Administrative Patent Judge.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing-in-Part, Granting-in-Part, and Denying-in-Part
Petitioner's Motion to Strike
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a). 37 C.F.R. §§ 42.20, 42.23(b), 42.64(c)*

IPR2021-01340
Patent 6,725,402 B1

## I.    INTRODUCTION

Applied Materials, Inc. ("Petitioner")[1] filed a Petition to institute *inter partes* review of claims 1–17 of U.S. Patent No. 6,725,402 B1 (Ex. 1001, "the '402 patent").  Paper 1 ("Pet." or "Petition").  We instituted trial on February 9, 2022.  Paper 14 ("Inst. Dec.").  During trial, Ocean Semiconductor LLC ("Patent Owner")[2] filed a Patent Owner Response.  Paper 18 ("PO Resp.").  Later filings include Petitioner's Reply (Paper 26 ("Pet. Reply"))[3] and Patent Owner's Sur-reply (Paper 36 ("Sur-reply")).  We also authorized Petitioner to file a Motion to Strike (Paper 38 ("Mot.")) to which Patent Owner filed an Opposition (Paper 41 ("Mot. Opp.")) and Petitioner filed a Reply (Paper 44 ("Mot. Reply")).  In addition, Petitioner filed a Motion to Exclude (Paper 42 ("Mot. Excl.")) to which Patent Owner filed an Opposition (Paper 43 ("Mot. Excl. Opp.")) and Petitioner filed a Reply (Paper 44 ("Mot. Excl. Reply").  An oral hearing was held on October 26, 2022, and a transcript is entered in the record.  Paper 51 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(b).  After considering the

---

[1] Petitioner identifies itself, Applied Materials, Inc., as the real party-in-interest.  Petitioner also identifies PDF Solutions, Inc. as a "potential real party-in-interest" with whom Petitioner "discussed this Petition and the Ground presented."  Pet. 1.  Petitioner further lists a number of other "potential real parties-in-interest, none of whom had any access to this Petition."  *Id.* at 1–2.

[2] Patent Owner identifies itself, Ocean Semiconductor LLC, as the real party-in-interest.  Paper 5, 2.

[3] Paper 26 is an "amended" version of a Reply filed earlier the same day.  Petitioner filed an amended version of its Reply to correct what we deemed to be a harmless error in its original filing.  Ex. 3001.

2

IPR2021-01340
Patent 6,725,402 B1

parties' arguments and evidence, we determine that Petitioner has proved by a preponderance of the evidence that the challenged claims are unpatentable. *See* 35 U.S.C. § 316(e).  We dismiss-in-part as moot, grant-in-part, and deny-in-part, Petitioner's Motion to Strike.  We dismiss Petitioner's Motion to Exclude as moot.  Our reasoning is explained below, and we issue this Final Written Decision under 35 U.S.C. § 318(a).

### A. Related Proceedings

According to the parties, Patent Owner has asserted the '402 patent against defendants including: Analog Devices, Inc.; Infineon Tech. AG; Huawei Device USA, Inc.; MediaTek Inc.; NVIDIA Corp.; NXP USA, Inc.; Renesas Elec. Corp.; Silicon Labs. Inc.; STMicroelectronics Inc.; and Western Digital Tech., Inc. in lawsuits in district courts in the District of Massachusetts, the Eastern District of Texas, and the Western District of Texas.  Pet. 2; Paper 5, 2.  Petitioner indicates that it is not a party to any pending litigations involving the '402 patent.  Pet. 7.

3

IPR2021-01340
Patent 6,725,402 B1

### B. Asserted Ground of Unpatentability

Petitioner asserts one ground of unpatentability in this Petition

(Pet. 14–15), which is provided in the table below:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–17 | 103(a)[4] | Coronel[5], Fox[6] |

Petitioner relies on the declaration of Dr. Miltiadis Hatalis, among

other evidence.  Ex. 1002.  Patent Owner relies on the declaration of Kurt D.

Humphrey, among other evidence.  Ex. 2040.

### C. Technology Overview & the '402 Patent

The '402 patent relates to "fault detection and control of a processing

tool using an Advanced Process Control (APC) framework" in the field of

semiconductor fabrication.  Ex. 1001, 1:9–12.  By way of background, the

'402 patent explains that "[a]lthough there has been an improvement in

detecting faults associated with semiconductor manufacturing processes, one

problem currently encountered . . . is the delay in reporting these faults such

that corrective measures can be implemented in a more expedient manner."

*Id.* at 1:29–34.  The '402 patent seeks to address this problem, which can

result in a number of faulty devices being produced.  *Id.* at 1:34–39.

---

[4] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284
(2011) ("AIA"), amended 35 U.S.C. § 103.  Based on the filing date of the
'402 patent, we apply the pre-AIA version of § 103.
[5] Coronel et al., EP 0 932 194 A1, published July 28, 1999 (Ex. 1006,
"Coronel").
[6] Fox et al., US 5,479,340, issued Dec. 26, 1995 (Ex. 1005, "Fox").

4

IPR2021-01340
Patent 6,725,402 B1

Figure 1 of the '402 patent (reproduced below) shows a system for determining fault detection based on process tool operational state data in a semiconductor fabrication process. *Id.* at 2:41–45.



**Figure 1**

As shown above, the system in Figure 1 includes processing tool 105, which "is in the form of semiconductor fabrication equipment used to produce a processing piece, such as a silicon wafer." *Id.* at 2:45–48. Equipment interface 110 retrieves tool state data from tool 105, such as temperature, pressure, and gas flow, and "communicates this data to a fault detection system 120 via the data collection unit 130 to determine whether the tool 105 is experiencing a faulty operation." *Id.* at 2:58–65. More specifically,

5

the tool state data received by equipment interface 110 is collected by data collection unit 130, converted into a tool data file, and forwarded to fault detection system 120 for near real-time analysis. *Id.* at 3:28–34. Fault detection system 120 "sends the results of potential faults and/or proper operation of the tool 105 in the form of tool 'health' data to the Advanced Process Control (APC) framework 135." *Id.* at 4:19–24. APC 135 "may send control signals to the equipment interface 110 to control the processing tool 105 based upon the tool health data results forwarded from the fault detection system 120." *Id.* at 4:24–28.

### D. Challenged Claims

The '402 patent includes seventeen claims, each of which is challenged here. Pet. 14–15. Claims 1, 8, and 15 are independent. Claim 1 is illustrative of the challenged claims and reads as follows:

1.    A method comprising:

receiving at a first interface operational state data of a processing tool related to the manufacture of a processing piece;

sending the state data from the first interface to a fault detection unit, wherein the act of sending comprises:

sending the state data from the first interface to a data collection unit;

accumulating the state data at the data collection unit;

translating the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit; and

sending the translated state data from the data collection unit to the fault detection unit;

6

IPR2021-01340
Patent 6,725,402 B1

> determining if a fault condition exists with the processing tool based upon the state data received by the fault detection unit;

> performing a predetermined action on the processing tool in response to the presence of a fault condition; and

> sending an alarm signal indicative of the fault condition to an advanced process control framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit,

> wherein performing a predetermined action further comprises sending a signal by the framework to the first interface reflective of the predetermined action.

Ex. 1001, 7:10–38.

## II.    ANALYSIS

### A. *Principles of Law*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art;

7

IPR2021-01340
Patent 6,725,402 B1

(2) any differences between the claimed subject matter and the prior art;

(3) the level of ordinary skill in the art; and (4) secondary considerations of

nonobviousness when presented. *Graham v. John Deere Co.*, 383 U.S. 1,

17–18 (1966).

### B. *Person of Ordinary Skill in the Art ("POSA")*

In determining the level of skill in the art, we consider the problems

encountered in the art, the art's solutions to those problems, the rapidity with

which innovations are made, the sophistication of the technology, and the

educational level of active workers in the field. *Custom Accessories, Inc. v.*

*Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

Petitioner contends:

> A POSA would have at least a B.S. in mechanical engineering,
> electrical engineering, materials science engineering, or a related
> field, and four years of experience working with semiconductor
> fabrication processes and measurement techniques.

Pet. 18 (citing Ex. 1002 ¶ 29). Patent Owner does not dispute Petitioner's

proposed level of skill in the art, proposing only to add that "additional

education can compensate for less work experience and vice versa." PO

Resp. 6.

Petitioner's proposal appears to be generally consistent with the level

of skill reflected in the specification and in the cited prior art. *See Okajima*

*v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (explaining that specific

findings regarding ordinary skill level are not required "where the prior art

itself reflects an appropriate level and a need for testimony is not shown")

(quoting *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158,

8

IPR2021-01340
Patent 6,725,402 B1

163 (Fed. Cir. 1985)).  And we agree with Patent Owner that "additional education can compensate for less work experience and vice versa." Accordingly, we adopt Petitioner's proposed definition of the POSA level with the additional clarification proposed by Patent Owner.

### C. Claim Construction

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)."  37 C.F.R. § 42.100(b) (2020).  Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  *Id.*

Petitioner does not identify any claim terms that require construction. Pet. 15.  Patent Owner does not dispute Petitioner's assertion that no claim terms require construction.  PO Resp. 6.

We do not find it necessary to provide an express construction for any claim terms.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))); *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) ("[C]laim terms need only be construed 'to the extent necessary to resolve the controversy'").

9

IPR2021-01340
Patent 6,725,402 B1

### D. *Overview of the Asserted Prior Art*

    1.    <u>Coronel (Exhibit 1006)</u>

Coronel relates to a "[m]ethod and system for real-time in-situ interactive supervision of a step performed in a tool during [a] semiconductor wafer fabrication process." Ex. 1006, code (57). In particular, Coronel describes monitoring process parameters in an end-point controller and comparing them with data in a database to identify process deviations. *Id.* 1:5–19. "If a process deviation is detected, an alert code is flagged to signal an alarm and the adequate action is immediately taken." *Id.* at 1:22–24.

Figure 7 of Coronel (reproduced below) is a schematic showing an improved system for processing semiconductor wafers. *Id.* at 12:53–56.

10

IPR2021-01340
Patent 6,725,402 B1



FIG.7

Figure 7 depicts a system with a measurement unit "internally mounted in an EPD [end-point detection] controller and/or in tool 11." *Id.* at 13:3–6. In one alternative, measurement unit 17' "performs an indirect measurement (e.g. an etch rate) through the tool view-port." *Id.* at 13:6–9. In another alternative, measurement unit 17" "performs direct measurement (e.g. a thickness) on the wafer before it enters in any of the chambers composing the multi-chamber tool 11." *Id.* at 13:9–13. "Measurement results are transmitted in real-time to supervisor 35," which has "both computing and

11

IPR2021-01340
Patent 6,725,402 B1

data storage capabilities." *Id.* at 13:15–16, 40–41. Supervisor 35 is
connected to computer 12, where computer 12 "has the role of controlling
the physical process parameters of tool 11 during the wafer processing while
supervisor 35 is mainly interested by what happens to the wafer itself." *Id.*
at 13:41–45.

Figure 15 of Coronel (reproduced below) is a process flow for a wafer
fabrication process. *Id.* at 18:1–2.



The process flow in Figure 15 begins at step 48 with loading a wafer into a
tool chamber. *Id.* at 18:6–8. Computer 12 downloads batch and process
names, and, upon each wafer change, a wafer ID. *Id.* at 18:8–13. A
measurement is performed by measurement unit 17' or 17" at step 49,
although this measurement could also be performed prior to loading the
wafer. *Id.* at 18:13–22. At step 50, supervisor 35 stores the measurement in

12

IPR2021-01340
Patent 6,725,402 B1

database 46 for immediate or subsequent use. *Id.* at 18:22–33. "Supervisor
35 may either use the measurement result or instead retrieve corresponding
measurement data that were previously stored in database 46 to up-date (i.e.
to change one or several process parameters for the said processing step (box
50)." *Id.* at 18:25–29. Wafer processing is initiated and the EPD controller
is activated at step 51, and at step 52, "supervisor 35 starts the analysis of the
selected process parameters by applying the adequate algorithms stored in
the database to analyze the corresponding signals generated by the EPD
controller according to the analysis rules stored in the database." *Id.* at
18:37–42. At step 53, supervisor 35 tests whether any rejection criteria is
met, and "[i]f an anomaly (i.e. a deviation) is detected, supervisor 35
provides an alert code to the computer 12, so that the adequate action can be
immediately taken (step 54)." *Id.* at 18:44–53. Otherwise, "the step in
consideration is continued until the end (step 55)." *Id.* at 18:53–55. "The
alert code and the action to be taken constitute the so-called 'alarm report'
(step 56)." *Id.* at 19:2–4.

## 2.    Fox (Exhibit 1005)

Fox relates "to a technique of utilizing multivariate analysis for
monitoring and controlling a plasma process" in semiconductor processing
equipment. Ex. 1005, 1:9–12. In particular, Fox uses a "Hotelling's $T^2$
multivariate analysis" ("a statistical method well known in the prior art" (*id.*
at 4:7–9)) in which "[e]leven components of the RF spectra are measured
and converted as input variables to the $T^2$ calculation" and "[a] software
routine provides the necessary calculations to solve for Hotelling's $T^2$

13

IPR2021-01340
Patent 6,725,402 B1

value." *Id.* at 1:46–51. Fox then uses the $T^2$ output "to determine if the plasma process is within an acceptable tolerance." *Id.* at 1:52–53.

Figure 1 of Fox (reproduced below) is a block diagram showing equipment that can provide a multivariate analysis based on Hotelling's $T^2$ analysis to control a plasma process. *Id.* at 2:12–15.



**FIGURE 1**

Figure 1 depicts plasma processing equipment, or tool, 10 in which wafer 11 is processed in reaction chamber 13. *Id.* at 2:35–37. In an embodiment, "tool 10 is a plasma etcher in which the plasma 12 in chamber 13 is utilized to etch one or more layers of wafer 11." *Id.* at 2:39–41. A radio frequency (RF) sensor 15 measures RF properties in chamber 13. *Id.* at 2:50–52. Filter 17 separates raw data from sensor 15 into eleven components, which are stored in data storage memory 18. *Id.* at 2:67–3:, 3:26–28. Block 20 in Figure 1 includes a software program with an algorithm for calculating $T^2$, and memory 21 stores certain values needed for the $T^2$ calculation. *Id.* at 5:52–57. After calculating $T^2$ based on the input values from memory 18,

14

IPR2021-01340
Patent 6,725,402 B1

block 20 outputs this value to controller block 22, which "in essence, determines the value of the $T^2$ which is acceptable for a given process being run in tool 10." *Id.* at 5:57–63. In particular, Fox describes that an acceptable range of values are determined by an upper control limit (UCL) and a lower control limit (LCL), where "[t]he ideal Hotelling's $T^2$ values for a process are determined by running a number of samples and developing a baseline for that particular process." *Id.* at 5:65–6:11. "The parameter(s) which are used to measure the test wafers to develop the $T^2$ values [are] a design choice," and can include, for example, the "film thickness of the semiconductor layer being etched." *Id.* at 6:29–33. "Once the baseline numbers have been stored in memory 18, the system is set up to control the ongoing process of a production wafer." *Id.* at 7:5–7. During wafer processing, "[i]f the $T^2$ value is within the acceptable UCL/LCL range for the given ongoing process, the controller 22 allows the process to continue"; otherwise, "an out of tolerance signal is generated." *Id.* at 7:13–17.

### E. Obviousness over Coronel and Fox

Petitioner asserts that claims 1–17 are unpatentable as obvious over Coronel and Fox. Pet. 31–63. We provided an overview of the prior art above. For the reasons discussed below, we find that Petitioner has established, by a preponderance of the evidence, that the cited art teaches or suggests all of the elements of the challenged claims.

15

IPR2021-01340
Patent 6,725,402 B1

    1.    <u>Motivation to combine Coronel and Fox</u>

Petitioner contends that it would have been obvious to combine
Coronel and Fox with a reasonable expectation of success. Pet. 32–42. We
agree.

Coronel discloses a system for fabricating semiconductor wafers that
analyzes tool state data during wafer fabrication using a computer linked to a
processing tool for real-time in-situ fault detection. Ex. 1006, code (57); Ex.
1002 ¶ 68. Coronel's system stores "identified deviations . . . based on all
the possible causes of wafer rejection based on experimental or empirical or
other information known to the process engineers so far." Ex. 1006, 10:5–7.
During fault detection this stored data is compared to real-time in-situ data.
*Id.* at 10:25–39. "If a deviation is detected, the supervisor emits the alert
code to the computer controlling the process tool to flag an alarm and it
takes an immediate and appropriate action." *Id.* As background, Coronel
teaches, that in-situ monitoring of semiconductor manufacturing, including
of data relating to physical process parameters, involves a "huge quantity of
data of various types." *Id.* at 1:56–2:11.

Fox discloses an embodiment in which a plasma etching tool is
monitored in real time, providing data that is separated into eleven
components and stored as digital data in a data storage memory. Ex. 1005,
2:35–46, 2:61–3:14, 3:26–32. The eleven components are then used to
calculate a $T^2$ value. *Id.* at 4:51–57 ("[T]he present invention generates a
control signal based on the multivariate analysis of the eleven components of
the RF spectra. In the preferred embodiment, this is achieved in software by

16

IPR2021-01340
Patent 6,725,402 B1

generating an algorithm for calculating Hotelling's $T^2$ multivariate control equations."). Fox then sends the $T^2$ value to a controller for comparison to a known range of values stored in memory to determine if a deviation occurred. *Id.* at 5:46–6:11, 7:7–8:10; *see also* Ex. 1002 ¶ 76.

Fox discloses that applying multivariate analysis to fault detection is advantageous. Ex. 1005, 3:49–51, 3:63–67, 4:25–40; *see also* Ex. 1002 ¶ 73 (Dr. Hatalis's testimony discussing benefits of multivariate analysis taught in Fox). More specifically, Fox discloses that "analyzing all of the eleven component values [of an RF sensor monitoring plasma processing tool] independently" can be a "problem" because the "values are not truly independent in their relationship to each other" and that "a multivariate approach to analyzing the eleven components . . . is superior in determining the acceptable limits of the plasma process than looking at any one component . . . or alternatively, all eleven components independently of one another." Ex. 1005, 3:49–51, 3:63–67, 4:25–40.

In view of these teachings, we agree with Petitioner and Dr. Hatalis that "[a] POSA would have recognized that applying the teachings of Fox to the system of Coronel, . . . would have promoted the desired objective of increasing process yields by combining fault detection based on multivariate analysis of tool state data with fault detection based on data received from the monitoring equipment of Coronel." Ex. 1002 ¶ 74; Pet. 35–36.

The record supports Dr. Hatalis's testimony that "applying the methods disclosed in Fox to the system of Coronel would have been straightforward and an application of known techniques to improve a comparable system in the same way." Ex. 1002 ¶ 75. In this regard, the

17

record supports that multivariate analysis was known and used in the art. *Id.* ¶ 71 (Dr. Hatalis's testimony, citing Ex. 1013, 56–57 (article entitled "Practical issues in the deployment of a run-to-run control system in a semiconductor manufacturing facility," (*id.* at 52) teaching that "FDC [fault detection and classification] can take many forms in ProcessWORKS, from traditional process monitoring techniques such as statistical process control (SPC) to advanced multivariate analysis based on trace data")); *see also* Ex. 1005, 4:7–9 ("The use of the Hotelling's $T^2$ multivariate analysis is a statistical method well known in the prior art.")*.* In addition, as Dr. Hatalis explains, "because the methods described in Fox are executed using a computer, they would have been readily applied to the computer, database, and supervisor of Coronel." Ex. 1002 ¶ 76. Further, "performing fault detection by using $T^2$ values . . . had been previously implemented on an AME 5000 system, which is the same system referenced in Coronel," and "Fox implements the $T^2$ analysis with the same kind of tool used in Coronel, a plasma etcher." *Id.* ¶ 78 (Dr. Hatalis's testimony).

In view of the evidence that multivariate analysis was well-known and in view of the similarities between Coronel and Fox, we agree with Petitioner that a POSA would reasonably have expected success in combining Coronel and Fox. As Dr. Hatalis explains, modifying Coronel's method to include Fox's multivariate analysis would have "simply involved adapting the software in the supervisor of Coronel, which already has computing capabilities and storing in its database the $T^2$ values and UCL and LCL boundary values as taught by Fox." *Id.* ¶ 83. And we find no evidence that applying Fox's algorithms or methods to Coronel's computer would

18

IPR2021-01340
Patent 6,725,402 B1

have been uniquely challenging or difficult for one of ordinary skill in the art. *KSR* 550 U.S. at 417 ("if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its application is beyond his or her skill").

Patent Owner argues that Petitioner's motivation to combine Coronel and Fox is contrary to the teachings of Coronel of structures "without defect" and its disclosure of "an etch process perfectly conducted." PO Resp. 24 (citing Ex. 1006, 5:45–47, 11:35–45). This argument is not persuasive. The language quoted by Patent Owner is used by Coronel to describe Figure 4. Figure 4 is a "plot of signals displayed by an EPD controller monitoring step A of the 'AB ETCH' process . . . when the structure is without defect and when the etch process of step A is performed correctly." Ex. 1006, 11:35–39. Coronel uses Figure 4 to provide a comparison to Figure 8, which provides a "plot of signals displayed by an EPD controller" for a wafer that was not etched properly, as a way to illustrate how process engineers identify faults. *Id.* at 11:55–58, 14:44–15:11. Coronel does not use Figure 4 to illustrate, as Patent Owner seems to suggest, that wafer processing can be conducted perfectly, obviating the need for improved fault detection. Accordingly, we disagree with Patent Owner that Petitioner's asserted motivation to combine Coronel and Fox is contrary to the teachings of Coronel.

Patent Owner argues that Petitioner's asserted "motivation is generic and could apply to almost any manufacturing process, making it insufficiently related to specific problems in the art. *Id.* We disagree.

19

IPR2021-01340
Patent 6,725,402 B1

Petitioner provides specific reasons why the POSA would have combined
Coronel and Fox.  These reasons are grounded in the asserted art, as well as
the knowledge of the POSA, and supported by testimonial and documentary
evidence that remains unrebutted.  *See* Pet. 32–42 (citing evidence); Ex.
1002 ¶¶ 67–85; PO Resp. 24 (addressing motivation to combine Coronel and
Fox without specifically challenging reasons proffered by Petitioner).

      For example, Petitioner and Dr. Hatalis point out that fault detection
using $T^2$ values had previously been carried out using the same type of
system as in Coronel, and that Fox implements a $T^2$ analysis with the same
kind of tool used in Coronel, a plasma etcher.  Pet 37–38 (citing Ex. 1020,
308, 316; Ex. 1021, 384–385, 387; Ex. 1006, 2:21–28, 5:25–27, 6:29–31;
Ex. 1005, 2:35–45); Ex. 1002 ¶ 78 (citing same evidence).  Petitioner also
directs us to Fox's teaching that "analyzing all of the eleven component
values [of an RF sensor monitoring plasma processing tool] independently"
can be a "problem" because the "values are not truly independent in their
relationship to each other."  Ex. 1005, 3:49–51 (cited at Pet. 35–36); *see also*
Ex. 1002 ¶ 73 (Dr. Hatalis's testimony discussing this teaching).  And
Petitioner also directs us to Fox's teaching that "a multivariate approach to
analyzing the eleven components . . . is superior in determining the
acceptable limits of the plasma process than looking at any one component
. . . or alternatively, all eleven components independently of one another."
Ex. 1005, 4:45–40 (cited at Pet. 36); *see also* Ex. 1002 ¶ 74 (Dr. Hatalis's
testimony discussing this teaching).  In view of these teachings, we agree
with Dr. Hatalis that "[a] POSA would have recognized that applying the
teaching of Fox to the system of Coronel, . . . would have promoted the

<div align="center">20</div>

IPR2021-01340
Patent 6,725,402 B1

desired objective of increasing process yields by combining fault detection based on multivariate analysis of tool state data with fault detection based on data received from the monitoring equipment of Coronel." Ex. 1002 ¶ 74.

Accordingly, we find that Petitioner has established by a preponderance of the evidence that the POSA would have had reason to use combine Fox and Coronel in the manner set forth in the Petition and would reasonably have expected success in doing so.

### 2.    Analysis of independent claim 1

#### a)    *"A method comprising receiving at a first interface operational state data of a processing tool related to the manufacture of a processing piece"*

Petitioner contends that Coronel discloses "[a] method comprising receiving at a first interface operational state data of a processing tool related to the manufacture of a processing piece," as recited in claim 1. Pet. 42. We agree.

Coronel discloses that its computer receives tool data from data bus 13. Ex. 1006, 2:39-54, 3:49-51, 4:25-31, 13:41–45; Ex. 1002, ¶ 86. Petitioner contends, and we agree, that the POSA "would recognize that the portion of the computer hardware and software receiving operational tool state data over data bus 13 . . . acts as a first interface." Pet. 42 (citing Ex. 1002 ¶ 86). Patent Owner does not dispute that Coronel discloses this claim element. Having reviewed the evidence and argument of record, we find that Petitioner has established, by a preponderance of the evidence, that Coronel discloses a "method comprising receiving at a first interface

21

operational state data of a processing tool related to the manufacture of a

processing piece," as recited in claim 1.

> b)    *"sending the state data from the first interface to a fault detection unit, wherein the act of sending comprises: sending the state data from the first interface to a data collection unit"*

Petitioner contends that the combination of Coronel and Fox teaches

"sending the state data from the first interface to a fault detection unit,

wherein the act of sending comprises: sending the state data from the first

interface to a data collection unit," as recited in claim 1.  Pet. 42–43.  We

agree.

As discussed *supra* § II.E.2.b, the Coronel computer, acting as a first

interface, receives operational state data from a processing tool.  We agree

with, and credit, Dr. Hatalis's testimony that a POSA would have been

motivated to use "the data storage memory, data processing, and memory

components of a computer to calculate a $T^2$ value for facilitating an increase

in the quality and reliability of wafer production through multivariate

analysis fault detection," as taught by Fox.  Ex. 1002 ¶ 87 (citing Ex. 1020,

308; Ex. 1024, 351; Ex. 1005, 2:6–9).  With this modification, the Coronel

computer, acting as a first interface, "would send the state data received

from the processing tool via data bus 13 to a data storage memory (i.e., a

data collection unit), which as per the teachings of Fox 'can be a variety of

memory storage devices,' including 'a part of a hard disk in a personal

computer PC."  Pet. 42 (citing Ex. 1005, 3:26-32, 7:5-10; Ex. 1006, 2:39-54,

3:49-51, 4:25-31, 13:41-45).  Thus, we agree with Petitioner that, in the

22

IPR2021-01340
Patent 6,725,402 B1

method suggested by the combination of Coronel and Fox, "[t]he operational state data would . . . be sent from the first interface to a data collection unit." Pet. 43.

Patent Owner does not dispute that the cited art teaches this claim element. Having reviewed the evidence and argument of record, we find that Petitioner has established, by a preponderance of the evidence, that the combination of Coronel and Fox teaches "sending the state data from the first interface to a fault detection unit, wherein the act of sending comprises: sending the state data from the first interface to a data collection unit."

> c)    *"accumulating the state data at the data collection unit"*

Petitioner contends that the combination of Coronel and Fox teaches "accumulating the state data at the data collection unit," as recited in claim 1. Pet. 43. We agree.

Fox teaches that the state data is "stored as digital data in data storage memory," which can be "a variety of memory storage devices," including "part of a hard drive in a personal computer (PC)." Ex. 1005, 3:26–32. Dr. Hatalis explains that in the method suggested by the combination of Coronel and Fox, "the state data . . . would be accumulated as ASCII data files in the data storage memory device, which . . . would include part of the hard disk in the computer of Coronel." Ex. 1002 ¶ 88. We agree with Dr. Hatalis that the art supports storing the state data Coronel's memory device. Patent Owner does not dispute that the cited art discloses this claim element. Having reviewed the evidence and argument of record, we find that Petitioner has established, by a preponderance of the evidence, that the

23

combination of Coronel and Fox discloses "accumulating the state data at the data collection unit," as recited in claim 1.

> d)    *"translating the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit"*

Petitioner contends that the combination of Coronel and Fox suggests "translating the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit." Pet. 44–45. We agree.

Petitioner contends that after the state data is accumulated in the memory of Coronel's computer (according to Fox's teachings) it would be sent to the supervisor. Pet. 44. In the Coronel computer, "[s]upervisor 35 is connected . . . to the computer 12 via a bidirectional data bus 36, typically a SECS II link." Ex. 1006, 13:25–29; *see also* Ex. 1002 ¶ 89. In Fox, the accumulated tool state data is stored as ASCII data files. Ex. 1005, 3:26–32; *see also* Ex. 1002 ¶ 89. Petitioner contends, and we agree, that a POSA would have understood that Coronel's computer could use the SECS II link to transmit tool state data to the supervisor for fault detection. Pet. 44; Ex. 1002 ¶ 90. We also agree with Petitioner and Dr. Hatalis that "because the SECS II link between the computer and supervisor in Coronel would transmit ASCII formatted tool data or $T^2$ values to the supervisor, the computer must first translate the data or values to the SECS II format" and that such translation techniques were "well-known to a POSA." Pet. 44; Ex. 1002 ¶ 90. Accordingly, we agree with Petitioner that the POSA would

24

have found it obvious to translate the state data from a first communications protocol to a second communications protocol.[7]  We address Patent Owner's arguments relating to this limitation below.

Patent Owner argues that neither Coronel nor Fox teaches the translation element.  PO Resp. 22; *see also id.* at 23 ("Petitioner has not identified any disclosure of translation between two separate communications protocols in either Fox or Coronel.").  We do not find this persuasive.  We credit the unrebutted testimony of Dr. Hatalis that a POSA would have recognized that Coronel's computer could use the bidirectional data bus to transmit tool state data to the supervisor for fault detection, and that the POSA would have understood that "the computer **must** first translate the data from ASCII format or $T^2$ values from numeric data to the SECS II communications protocol."  Ex. 1002 ¶ 90 (emphasis added).  Accordingly, we agree with Petitioner that the combination of Coronel and Fox suggests the translation element.

---

[7] Petitioner asserts that, in the alternative, "translation could be considered to occur when the computer calculates the $T^2$ value, as this results in translating the state data to a format compatible with the fault detection algorithm taught by Fox, which a POSA would understand to be present in the Coronel supervisor."  Pet. 45.  We do not address this alternative theory because we find that the evidence supports Petitioner's other theory for why translation would have been obvious.  We note, however, that Petitioner appears to be correct that this alternative theory is unrebutted.  Pet. Reply 9 (asserting that Patent Owner "does not contest that calculation of the $T^2$ value by the Coronel computer results in translating the state data to a format compatible with the fault detection algorithm taught by Fox").

25

IPR2021-01340
Patent 6,725,402 B1

Patent Owner argues that the question is not whether "the technique for transmitting ASCII or numeric data using the SECS II communications protocol was well-known . . . but ***whether it would be possible to harmonize a combined system based on the disclosures of Coronel and Fox without incurring delays in reporting of faults when they occur.***" PO Resp. 22 (citing Ex. 2040 ¶ 68). Patent Owner points out that the '402 patent "identifies such delays as a drawback in prior art systems." *Id.* Patent Owner then explains that while "Coronel teaches 'a bidirectional data bus, typically a SECS II link' which connects the supervisor 35 to the computer[,] . . . Fox teaches the use of a different communications protocol, ASCII, for storing data in a memory storage device." *Id.* at 22–23. According to Patent Owner, this is a problem because a POSA "would have recognized that the addition of an ulterior software element capable of translating different data protocols in use within the combined systems of Coronel and Fox would have brought an additional degree of complexity to the system and compromised its ability to efficiently report faults." *Id.* at 23 (citing Ex. 2040 ¶ 70).

We are not persuaded by Patent Owner's translation delay arguments. Patent Owner cites the testimony of Mr. Humphrey to support that translating between the different protocols of Coronel and Fox would have brought "an additional degree complexity to the system and compromised its ability to efficiently report faults." Ex. 2040 ¶ 70. However, the persuasiveness of Mr. Humphrey's testimony is diminished by the absence of explanation and by the absence of citation to supporting evidence. *See In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1368 (Fed. Cir. 2004) ("[T]he

26

Board is entitled to weigh the declarations and conclude that the lack of
factual corroborations warrants discounting the opinions expressed in the
declarations."); 37 C.F.R. § 42.65 ("Expert testimony that does not disclose
the underlying facts or data on which the opinion is based is entitled to little
or no weight.").

Although Mr. Humphrey testifies that translation adds complexity, the
evidence of record supports that the translation technique on which
Petitioner relies was routine. Ex. 1002 ¶ 90 (Dr. Hatalis testimony that "[i]t
was well-known in the art how to transmit data in ASCII format or as
numeric data via the SECS II communications protocol"); Ex. 1001, 5:26–33
(explaining that translation between the communication protocol used by
"equipment interface 110" and "Common Object Request Broker
Architecture Interface Definition Language (COBRAIDL)" is "well known
to those of ordinary skill in the art" and, thus will "not be discussed . . . to
avoid unnecessarily obscuring the present invention"); *see also* Ex. 1018,
172 (article cited by Dr. Hatalis describing transmission of ASCII data over
SECS II protocol).  To the extent Mr. Humphrey's testimony that translation
adds "an additional degree complexity to the system and compromised its
ability to efficiently report faults" contradicts Dr. Hatalis's testimony, we
credit Dr. Hatalis over Mr. Humphrey.

Moreover, as discussed above, we credit Dr. Hatalis's testimony that a
POSA would have understood that it was necessary to translate from ASCII
to SECS II in order to transmit tool state data to the supervisor for fault
detection.  Ex. 1002 ¶ 90.  Given the evidence that the asserted translation
was both necessary and routine, we find that the potential for delays that

27

IPR2021-01340
Patent 6,725,402 B1

Patent Owner argues would be introduced by translating between the communication protocols of Fox and Coronel would not have discouraged the POSA from translation. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 (Fed. Cir. 2000) ("[T]he benefits, *both lost and gained,* should be weighed against one another.").

In its Sur-reply, Patent Owner argues that "ASCII is a data type whereas SECS II is a communications protocol." Sur-reply 8. Patent Owner supports this assertion by citing to a URL.[8] *Id.* Based on this assertion, Patent Owner argues: "[b]ecause ASCII is defined as a data type within the SECS II communication protocol, there is no factual basis for Petitioner to allege that the claimed translation step is necessitated by virtue of the combined use of ASCII data and SECS II communication protocol." *Id.* Petitioner contends that this is a new argument, and moves to strike it on that basis. *See* Mot.

We agree that this is a new argument. The Petition clearly asserts that translating between ASCII and SECS II meets the limitation requiring "translating the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit." Pet. 44. Patent Owner's Response did not challenge that translating between ASCII and SECS II was a translation between two different communication protocols. PO Resp. 22–23 (addressing "translation" limitation without

---

[8] Petitioner has moved to exclude and to strike the URL. Mot; Mot. Excl. We address Petitioner's Motion to Exclude and Motion to Strike *infra* §§ III & IV.

28

IPR2021-01340
Patent 6,725,402 B1

making this argument).  Petitioner's Reply relied on the absence of a
challenge to this issue.  Pet. Reply 8–9 (Noting that Patent Owner "does not
question the fact that conversion from ASCII format to SECS II . . .
constitutes a translation" and that Patent Owner does not "dispute that a
POSA would have understood the need for such a translation when
combining the teachings of Coronel with Fox.").   Accordingly, we
determine that Patent Owner has waived its argument that translating
between ASCII and SECS II does not involve translating between two
different communications protocols.  Paper 15, 9 ("Patent Owner is
cautioned that any arguments not raised in the response may be deemed
waived").

Even if we were to consider Patent Owner's argument that ASCII is
not a communications protocol and, thus, translation from ASCII to SECS II
does not meet the limitation requiring "translating the state data from a first
communications protocol to a second communications protocol compatible
with the fault detection unit," we would not find it persuasive in view of
Patent Owner's and Mr. Humphrey's admissions to the contrary.  *See e.g.*,
2040 ¶ 70 (Mr. Humphrey testifying that "Fox teaches the use of a different
communications protocol, ASCII" and noting the "different data protocols in
use within the combined systems of Coronel and Fox"); PO Resp. 22–23
(making arguments identical to the quoted testimony from Mr. Humphrey);
Sur-reply 9 ("the fact that the Coronel and Fox systems employ different
data communications protocols is indicative of an absence of a motivation to
combine the two systems"); *see also* Ex. 2044, 85:19–22 (testimony of Dr.
Hatalis: "Fox is referring to ASCII, the data files in memory.  But a person

29

IPR2021-01340
Patent 6,725,402 B1

skilled in the art would also know that ASCII is also a form of – or a protocol in data communications.").

Accordingly, we find that Petitioner has established, by a preponderance of the evidence, that a POSA would have found it obvious to translate the state data from a first communications protocol to a second communications protocol.

> e)    *"sending the translated data from the data collection unit to the fault detection unit"*

Petitioner contends that the combination of Coronel and Fox teaches "sending the translated state data from the data collection unit to the fault detection unit," as recited in claim 1. Pet. 45. We agree.

Fox teaches sending the calculated $T^2$ value from the data processing unit in the computer to a controller that acts as a fault detection unit ("FDU"). Ex. 1005, 5:52–65 ("the algorithm for calculating the $T^2$ is retained as a software program in block 20;" "the output of block 20 is the $T^2$ value . . . [t]his $T^2$ value is then used as an input to the controller block 22;" "[b]lock 22, in essence determines the value of the $T^2$ which is acceptable for a given process being run in tool 10"); *see also id.* at 7:5–8:4; Ex. 1002 ¶ 92. In Coronel, a bidirectional data bus connects the computer to a supervisor that acts as an FDU. Ex. 1006, 10:25–39 (teaching that the supervisor monitors "selected parameters" and "[i]f a deviation is detected, . . . emits the alert code to the computer controlling the process tool to flag an alarm"), 13:25–27 ("Supervisor 35 is connected on the one hand to the computer 12 via a bidirectional data bus 36, typically a SECS II link"), 18:50–55 ("If an anomaly (i.e. a deviation) is detected, supervisor 35

30

IPR2021-01340
Patent 6,725,402 B1

provides an alert code to the computer 12, so that the adequate action can be immediately taken (step 54)")"; Ex. 1002 ¶¶ 92–93.

We agree with Dr. Hatalis that "A POSA would have had the motivation to keep a similar connection in the method of Coronel combined with the teachings of Fox in view of Coronel already employing the supervisor as a fault detection unit." Ex. 1002 ¶ 92. We further agree that a POSA would have recognized that bidirectional data bus 36, which is typically a SECS II link, would have been "capable of transmitting the $T^2$ value calculated by the computer's data processing and memory components" and that the supervisor would have been "capable of analyzing the $T^2$ values obtained from the data processing unit in the computer of Coronel." *Id.* ¶¶ 93–94. We credit the testimony of Dr. Hatalis and further, we agree that in the combination of Coronel and Fox, a POSA would have understood that "once the state data is translated by the computer of Coronel, [it] would then be sent to the fault detection unit, i.e., supervisor, for analysis." *Id.* ¶ 92.

Patent Owner does not dispute that the cited art teaches this claim element. Having reviewed the evidence and argument of record, we find that Petitioner has established, by a preponderance of the evidence, that the combination of Coronel and Fox teaches "sending the state data from the first interface to a fault detection unit, wherein the act of sending comprises: sending the state data from the first interface to a data collection unit."

31

> f)    *"determining if a fault condition exists with the processing tool based upon the state data received by the fault detection unit"*

Petitioner contends that the combination of Coronel and Fox teaches "determining if a fault condition exists with the processing tool based upon the state data received by the fault detection unit." Pet. 47–48. We agree.

Coronel's supervisor includes an internal database which contains "alarm" related data corresponding to "normal" and "abnormal" situations. Ex. 1006, 13:56–14:34 ("All the data . . . which are representative of the normal situation and of the identified abnormal situations . . . are stored in the database of supervisor 35"), 18:33–19:7 ("Upon occurrence of any selected process parameter drift, the supervisor 35 tests if any of the rejection criteria set up by the process engineers is met"); *see also* Ex. 1002 ¶ 96.

Fox discloses a similar approach. Fox first determines a baseline for "ideal Hotelling's $T^2$ values" and "the upper control limit (UCL) and the lower control limit (LCL)." Ex. 1005, 6:8–11 ("The ideal Hotelling's $T^2$ values for a process are determined by running a number of samples and developing a baseline for that particular process."), 6:64–65 ("Subsequently, the UCL and the LCL limits can be established."). The $T^2$ values and the UCL and LCL limits are stored in memory. *Id.* at 7:5. Then Fox's system compares $T^2$ values derived from an ongoing process to the baseline data stored in memory, generating an "out of tolerance signal" if the $T^2$ value is "not within the acceptable UCL/LCL tolerance." *Id.* at 7:5–17.

We agree with Petitioner and Dr. Hatalis that in the method suggested by the combination of Coronel and Fox, a POSA would have been motivated

32

IPR2021-01340
Patent 6,725,402 B1

to use "[t]he Coronel supervisor, which has 'both computing and data storage capabilities,'" to "determine if a fault condition exists based on $T^2$ values," as taught by Fox.  Pet. 47; Ex. 1002 ¶ 96.  In this modified method, the database of Coronel's supervisor would store a "baseline of 'ideal Hotelling's $T^2$ values' and 'the upper control limit (UCL) and the lower control limit (LCL).'"  Pet. 47.  The supervisor would then "analyze the $T^2$ values received from the computer data processing unit . . . by comparing them to the 'ideal Hotelling's T2 values' and acceptable UCL/LCL range for the given process, as taught by Fox."  *Id.*  If the $T^2$ value received from the computer data processing unit was not within acceptable tolerance, the Coronel supervisor would generate an alarm, thus acting as an FDU.  *Id.* at 47–48; Ex. 1002 ¶ 97.

Patent Owner does not dispute that the cited art teaches this claim element.  Having reviewed the evidence and argument of record, we find that Petitioner has established, by a preponderance of the evidence, that the combination of Coronel and Fox teaches "determining if a fault condition exists with the processing tool based upon the state data received by the fault detection unit."

> g)    *"performing a predetermined action on the processing tool based upon the state data received by the fault detection unit"*

Petitioner contends that the combination of Fox and Coronel teaches "performing a predetermined action on the processing tool based upon the state data received by the fault detection unit" because Fox teaches that "the controller generates an out-of-tolerance signal if the $T^2$ values it receives are

33

not within the acceptable UCL/LCL range." Pet. 48 (citing Ex. 1005, 7:13–17; Ex. 1002 ¶ 98). The evidence supports Petitioner's contention.

Fox discloses that its "out-of-tolerance control signal can be utilized . . . to terminate the ongoing process . . . [or] to inform the data collection system to identify the component or components which may be causing the out-of-tolerance condition." Ex. 1005, 7:18–8:4; Ex. 1002 ¶ 98. Petitioner and Dr. Hatalis assert, and we agree, that a POSA would have been motivated "to use a similar technique when combining Coronel with the teachings of Fox because Coronel already discloses connecting the supervisor and computer to function in the same manner." Ex. 1002 ¶ 98 (citing Ex. 1006, 10:25–38, 18:50–55); Pet. 48. More specifically, Coronel's supervisor emits an alert to the computer to take immediate and appropriate action when it identifies a deviation from monitoring equipment data. Ex. 1006, 10:34–38, 18:50–55; Ex. 1002 ¶ 99. As explained by Dr. Hatalis, in the method suggested by Coronel and Fox, "the supervisor, upon detecting a deviation in the tool state data from comparing the $T^2$ values to the acceptable UCL/LCL range, would emit an alert to the computer to take immediate and appropriate action on the processing tool." Ex. 1002 ¶ 99 (citing Ex. 1005, 7:14–8:4; Ex. 1006, 10:34–38; 18:50–55, 19:56–20:1).

Patent Owner does not dispute that the cited art teaches this claim element. Having reviewed the evidence and argument of record, we find that Petitioner has established, by a preponderance of the evidence, that the combination of Coronel and Fox teaches "performing a predetermined action

34

on the processing tool based upon the state data received by the fault

detection unit."

> h)    *"sending an alarm signal indicative of the fault condition to an advanced process control framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit"*

Petitioner contends that the combination of Coronel and Fox teaches

"sending an alarm signal indicative of the fault condition to an advanced

process control framework from the fault detection unit providing that a fault

condition of the processing tool was determined by the fault detection unit,"

as recited in claim 1.  Pet. 49–51.  More specifically, Petitioner contends:

> Coronel discloses that its computer can stop a process if the supervisor detects a deviation, including stopping the processing tool.  A POSA would therefore have understood that the portion of the hardware and software of the Coronel computer (e.g., a program residing in part of the computer memory) also functions as an APC that receives an alarm signal from the supervisor, upon the supervisor detecting a fault, and then acts upon receiving the signal.

*Id.* at 50 (internal citations omitted).

Patent Owner argues that the combination of Coronel and Fox does

not teach an "advanced process control framework" as recited in claim 1.

PO Resp. 17–20.  Patent Owner points to the specification of the '402 patent

which discloses:

> A plan executor (PE) 330 (i.e., a process controller) manages the APC framework 135 and provides possible solutions to problems found with the tool health data that was forwarded by the fault detection system 120. The framework 135 further

35

IPR2021-01340
Patent 6,725,402 B1

> includes an applications interface (AI) 340 for interfacing with
> third-party applications that run on the fault detection system
> 120.

Ex. 1001, 4:61–67 (cited at Ex. 2040 ¶ 65 (Mr. Humphrey's testimony),

which itself is cited at PO Resp. 18). Patent Owner then argues that

"[n]either Fox nor Coronel (alone or in combination) teaches a similar

system that includes a process controller, i.e., plan executor, that manages an

APC framework, i.e. an APC framework that provides solutions to model-

based tool health data." PO Resp. 18–19. According to Patent Owner, the

"distinction between the '402 patent methods and those of Fox and Coronel

are detailed in Steps 460–480 in Figure 4B" (PO Resp. 19), which is

reproduced below.



36

Ex. 1001, Fig. 4. Figure 4B is a flowchart, including three steps. *Id.* The first step in Figure 4B, step 460, is to "Forward Tool Health Data to Plan Executor of APC Framework." *Id.* The second step, step 470, is: "Plan Executor of APC Framework Inspects Tool Health Data for a Fault Condition." *Id.* And the third and final step in Figure 4B, step 480, is: "Plan Executor of APC Framework Performs a Predetermined Action Based Upon Results of Tool Health Data." *Id.* Patent Owner does not articulate how or why these steps distinguish the method of the '402 patent from that of Coronel and Fox. *See* PO Resp. 19.

We agree with Petitioner that the combination of Coronel and Fox teaches sending an alarm signal to an advanced process control framework.

Coronel discloses that its computer controls the response when a "deviation" is detected and can stop a process or a process tool upon receipt of an alarm signal from the supervisor. Ex. 1006, 10:34–38 ("If a deviation is detected, the supervisor emits the alert code to the computer controlling the process tool to flag an alarm and it takes an immediate and appropriate action."), 18:50–55 ("If an anomaly (i.e. a deviation) is detected, supervisor 35 provides an alert code to the computer 12, so that the adequate action can be immediately take."), 19:54–20:1 (Coronel teaching that "[i]f an anomaly is detected . . . the corresponding alert code is sent to the computer 12 to take the appropriate action" and that "depending upon the seriousness of the deviation, either the process or the tool can be stopped."). Dr. Hatalis testifies that based on this disclosure, a POSA would have understood that a "portion of the hardware and software of the computer in Coronel (e.g., a program that resides in a portion of the computer memory) would also act as

37

IPR2021-01340
Patent 6,725,402 B1

an APC that receives an alarm signal from the supervisor upon the supervisor detecting a fault and then acts upon receiving it."
Ex. 1002 ¶ 100; *see also id.* ¶ 56.  This testimony is consistent with the disclosure in Coronel and we credit it accordingly.

Patent Owner relies on the testimony of Mr. Humphrey to counter Dr. Hatalis's testimony.  PO Resp. 18–19 (citing Ex. 2040 ¶ 65). Mr. Humphrey describes the APC framework of the '402 patent and then testifies that Coronel does not teach an APC like that described in the'402 patent.  More specifically, Mr. Humphrey states: "Neither Fox nor Coronel (alone or in combination) teaches a similar system that includes a process controller, i.e. plan executor, that manages an APC framework, i.e. an APC framework that provides possible solutions to model-based tool health data." Ex. 2040 ¶ 65.  Mr. Humphrey does not expressly assert that Coronel lacks an APC altogether.  Rather, Mr. Humphrey asserts that Coronel lacks an APC that includes a "process controller, i.e. plan executor." *Id.*  This leaves some ambiguity on whether Mr. Humphrey disputes that Coronel has an APC or disputes only that Coronel's APC lacks a process controller.  We find it helpful to address both possibilities separately.

We begin by considering the possibility that Patent Owner and Mr. Humphrey contend that Coronel lacks an APC altogether.  As discussed above, Dr. Hatalis testifies that a portion of Coronel's computer acts as an APC.  Ex. 1002 ¶ 100; *see also id.* ¶ 56.  This testimony is unambiguous and consistent with Coronel.  In addition, the evidence supports that APCs were known to be standardized, commercially-available, software components. Ex. 1040, 14:4–19 (testimony of Mr. Humphrey that APC systems were

38

IPR2021-01340
Patent 6,725,402 B1

available for purchase from commercial vendors component during the time
when he worked at Rockwell); Ex. 2041, 2 (Mr. Humphrey's CV,
representing that he was employed at Rockwell Semiconductor Systems
from 1995–99); Ex. 1001, 4:40–44 (specification of the '402 patent
describing an APC framework as a "component-based architecture
comprised of interchangeable, standardized software components enabling
run-to-run control of the processing tool"). The ready availability of APCs
at the time Coronel is consistent with and tends to support Dr. Hatalis's
testimony. Countering this is the ambiguous testimony of Mr. Humphrey
that Coronel does not have an APC like that described in the '402 patent,
"that includes a process controller, i.e. plan executor, that manages an APC
framework." Ex. 2040 ¶ 65. To the extent Mr. Humphrey's testimony is
that Coronel lacks an APC altogether, we credit the unambiguous, well-
supported testimony of Dr. Hatalis (Ex. 1002 ¶¶ 56, 100) over the
ambiguous testimony of Mr. Humphrey (Ex. 2040 ¶ 65). In light of the
above, we find that Coronel has an APC.

We next consider whether Coronel's APC can be differentiated from
the claimed APC on the basis suggested by Mr. Humphrey, i.e., that it lacks
process controller/plan executor. Coronel teaches that its computer controls
the process tool, takes immediate action in response to an alert code, and can
stop either the process or the tool. Ex. 1006, 10:34–38, 18:50–55, 19:54–
20:1. This supports that Coronel's computer can act as a process controller.
In addition, as reflected in the deposition testimony of Mr. Humphrey, the
evidence supports that including a process controller/plan executor in an
APC was both necessary and an industry standard:

39

IPR2021-01340
Patent 6,725,402 B1

>[Petitioner's counsel]: So in this paragraph, you note that the APC framework of the '402 patent includes a plan executor, correct?
>
>[Mr. Humphrey]: Yes.
>
>[Petitioner's counsel]: Does every APC have a plan executor?
>
>[Mr. Humphrey]: Generally speaking, yes, APC frameworks include a plan executor or a module or component that serves that function.
>
>[Petitioner's counsel]: And that's what the understanding would be in industry?
>
>[Mr. Humphrey]: Yes.
>
>[Petitioner's counsel]: Is it possible to have an APC without a plan executor?
>
>[Mr. Humphrey]: No. I believe the -- if you want to be compatible with the semistandards associated with APC frameworks, then a plan executor or similar component or function is more or less a part of the definition of the framework.
>
>[Petitioner's counsel]: So a person having ordinary skill in the art would have understood, then, that an APC would include a plan executor. Is that right?
>
>[Mr. Humphery]: It's part of the industry standard.

Ex. 1040, 100:14–101:16 (objections omitted for readability). This testimony supports that, because Coronel has an APC, that APC must include a plan executor. To the extent Mr. Humphrey's declaration testimony is to the contrary (*see* Ex. 2040 ¶ 65), we give it little weight. Consistent with Mr. Humphrey's deposition testimony, and the disclosures in Coronel regarding the computer's ability to exert control, Dr. Hatalis testifies that the portion of the computer that acts as an APC "send[s] control signals, such as a shutdown signal" and "acts upon receiving" and alarm signal from the supervisor. Ex. 1002 ¶¶ 56, 100. Considering the totality of the evidence, including the disclosures of Coronel, and the testimony of

40

Dr. Hatalis and Mr. Humphrey, we find that the portion of Coronel's computer that acts as an APC has a plan executor.

As to Patent Owner's argument that Figure 4B of the '402 patent (reproduced above) reflects a distinction between the APC described in the '402 patent and in Coronel, we disagree.  Figure 4B identifies the actions taken by the process controller/plan executor component of the APC of the '402 patent.  Ex. 1001, Fig. 4B.  It, reflects the same process control functionalities described in Coronel.  In Figure 4B: 1) the "plan executor" of the APC receives health data, 2) the plan executor inspects the health data for a fault condition, and 3) the plan executor performs a predetermined action.  *Id.*  Coronel teaches that "[i]f a deviation is detected, the supervisor [i.e., the fault detection unit] emits the alert code to the computer controlling the process tool [i.e., the APC] to flag an alarm and it takes an immediate and appropriate action [i.e., a predetermined action]."  Ex. 1006, 10:34–39. Patent Owner does not articulate how the method described in Figure 4B differentiates the claimed APC from the APC in Coronel (PO Resp. 19) and we do not find a meaningful difference between the APC described in Figure 4B and that described in Coronel.

In its Sur-reply, Patent Owner points to the deposition testimony of Dr. Hatalis that an APC framework has specific hardware and software components and argues that "Petitioner has never at any point identified, except in the most general terms, how Coronel and/or Fox disclose(s) the full panoply of software functions and hardware elements that Dr. Hatalis has identified in an APC."  Sur-reply 3–4.  We find that this argument was waived because it was not included in Patent Owner's Response.

41

IPR2021-01340
Patent 6,725,402 B1

To the extent Patent Owner's argument is grounded in claim construction – i.e., that the term "advanced process control framework" in claim 1 must be construed to include the specific hardware and software components identified by Dr. Hatalis in his deposition, both parties have made very clear that there is no need to construe the APC term.  Pet. 15 ("No term needs to be construed."); PO Resp. 6 ("Patent Owner does not presently believe that claim construction is necessary.").  In its Reply, following the guidance set forth in the Consolidated Trial Practice Guide ("CTPG") that "[p]arties should submit a prior claim construction determination by a federal court . . . as soon as it becomes available," Petitioner submitted the claim construction provided by the Eastern District of Texas in *Ocean Semiconductor LLC v. Huawei Device USA, Inc.,* 4:20-CV-00991 ALM.  Pet. Reply 4; CTPG, 47.[9]  But Petitioner did not request that we adopt this construction or otherwise ground its argument in the district court's claim construction.  Pet. Reply 4.  Accordingly, we do not agree with Patent Owner that Petitioner's submission of the district court's claim construction raised the issue of how the APC term should be construed.  Mot. Opp. 4.

Moreover, as stated *supra* § II.C, we determine that we do not need to construe any claim terms in order to resolve this dispute.  As Patent Owner itself admits, the term "advanced process control" was well understood in

---

[9] The district court construed APC to mean "a component-based architecture comprised of interchangeable, standardized software components enabling run-to-run control of the processing tool," a definition taken word for word from the specification of the '402 patent.  Ex. 1042, 38; Ex. 1001, 4:40–44.

42

IPR2021-01340
Patent 6,725,402 B1

the art.  Sur-reply, 3 ("The fact that none of the six defendants in the underlying WDTX actions requested that this term be construed (which Petitioner ignored and failed to mention in its Petition and Reply) further reinforces that this term [advanced process control] is an industry coined term and well-known in the art with a defined meaning.").  Here, as discussed above, the evidence supports that Coronel has an advanced process control and we do not need to construe the term to address those arguments that were timely raised by Patent Owner – i.e., that Coronel lacks an APC with a process controller/plan executor and that Figure 4B of the '402 patent distinguishes the claimed APC from Coronel's APC.

As to the factual aspects of Patent Owner's belated argument that Coronel lacks the "full panoply of software functions and hardware elements that Dr. Hatalis has identified in an APC" (Sur-reply 3–4), we will not resolve these issues on an incomplete record.  We note however that Patent Owner's assertions that Coronel lacks a "fault detection or diagnosis of maintenance" component, "a controller," "a component that modifies tool settings," and "interfaces that receive and send signals," appear to be contrary to the disclosure of Coronel.  *See, e.g.,* Ex. 1006, 10:34–38, 18:50–55, 19:54–20:1.

Patent Owner argues that Coronel "attributes key functions such as fault detection and alarms to the supervisor rather than the computer."  Sur-reply 5.  This argument is also waived because it was not included in Petitioner's Response.  *See* PO Resp. 17–20 (addressing the "advanced process control limitation" without making this argument).  But even if we were to consider it, we would not find it persuasive because this is exactly

43

IPR2021-01340
Patent 6,725,402 B1

what is recited in the claim 1 and what is described in the specification of the '402 patent: a fault detection unit detects a fault and sends an alarm to the APC. *See e.g.,* Ex. 1001, 7:31–33 (claim 1 reciting, "sending an alarm signal indicative of the fault condition to an advanced process control framework from the fault detection unit"); 4:19–28 ("The fault detection system 120 . . . sends the results of potential faults and/or proper operation of the tool 105 in the form of tool 'health' data to the Advanced Process Control (APC) framework 135").

Accordingly, we find that Petitioner has established, by a preponderance of the evidence, that the combination of Coronel and Fox teaches "sending an alarm signal indicative of the fault condition to an advanced process control framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit."

> i) *"wherein performing a predetermined action further comprises sending a signal by the framework to the first interface reflective of the predetermined action."*

Petitioner contends that a POSA would have understood that the portion of Coronel's computer acting as an APC, "upon receiving the alarm signal from the supervisor, would also have sent a signal to the part of the computer acting as the first interface . . . to perform a predetermined action on the processing tool responsive to the fault detected because that part of the computer 'has the role of controlling the physical process parameters of tool[s] during the wafer processing.'" Pet. 50 (quoting Ex. 1006, 13:42–44).

44

IPR2021-01340
Patent 6,725,402 B1

Patent Owner points out that Petitioner's position has the computer functioning as both the APC and the first interface and argues that "[i]t is simply illogical that the computer 12 of Coronel would send a signal *to itself* reflective of information that it already possesses." PO Resp. 21. Patent Owner asserts that "[t]he computer cannot simultaneously represent both the framework and the first interface of the '402 patent." *Id.* According to Patent Owner, "[n]othing in Coronel indicates that the computer 12 is divided into different portions, such that these portions independently interact with other elements in the process flow or handle individual steps." *Id.* Finally, Patent Owner argues that "[b]ecause claims should not be construed so as to render terms superfluous, Petitioner's assertion that sending an 'alert code *to the computer*' meets 'sending a signal by the [APC] framework *to the first interface* reflective of the predetermined action' is factually and legally incorrect." Sur-reply 7 (alteration in original).

We agree with Petitioner that the combination of Coronel and Fox teaches that the APC sends a signal to the first interface reflective of a predetermined action.

We have already found that a portion of Coronel's computer acts as a first interface and a portion of Coronel's computer acts and an APC. *See supra* §§ II.E.2.a, II.E.2.h. Other than Mr. Humphrey's unpersuasive argument (addressed *supra* § II.E.2.h) that Coronel lacks an APC with a process controller/plan executor and that Coronel lacks an APC that is distinct from that depicted in Figure 4B of the '402 patent, Dr. Hatalis's testimony that a POSA would recognize that a portion of Coronel's

45

computer acts as a first interface and a portion acts as an APC is unrebutted. *See* Ex. 1002 ¶¶ 56, 86, 100–102. We credit this testimony. For this reason we are not persuaded by Patent Owner's argument that nothing in Coronel indicates that its computer is divided into different portions.[10] We also find that Dr. Hatalis's testimony was sufficiently specific, and thus reject Patent Owner's argument that Petitioner failed to "define with any specificity where the boundaries between the 'portions' of the computer that it posits lie." Sur-reply 7.

Moreover, we do not agree with Patent Owner that it would be illogical for a computer to have different portions (for example, programs residing in memory) that interact with each other.[11] As discussed above, Dr. Hatalis testifies that this is what happens in Coronel's computer and Patent Owner does not direct us to persuasive evidence to the contrary. *See, Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989) ("Attorneys' argument is no substitute for evidence."); *In re Pearson*, 494 F.2d 1399, 1405 (CCPA 1974). As to Patent Owner's argument that Petitioner's reliance on Coronel's computer renders the claim language superfluous, we

---

[10] This argument is also inconsistent with Coronel's Figure 7, which depicts the computer as having three interfaces in the form of data busses 13, 18, and 36. Ex. 1006, Fig. 7.

[11] We made this same point in our institution decision (Inst. Dec. 29), and Patent Owner does not persuasively address it here (*See* PO Resp. 20–21 (asserting that Petitioner's position is illogical, but relying only on attorney argument and not providing persuasive explanation why it would be illogical); Sur-reply 6–8 (same)).

46

IPR2021-01340
Patent 6,725,402 B1

do not agree because, as discussed above, we consider Coronel's computer to be comprised of two different portions that interact with each other.

Accordingly, we find that Petitioner has established, by a preponderance of the evidence, that the combination of Coronel and Fox teaches "wherein performing a predetermined action further comprises sending a signal by the framework to the first interface reflective of the predetermined action."

### *j)*     *Conclusion as to claim 1*

For the reasons set forth above, we find that the combination of Coronel and Fox renders obvious the method of claim 1. We also find that one of ordinary skill in the art would have been motivated to combine Coronel and Fox with a reasonable expectation of arriving at the challenged claims. Accordingly, we find that Petitioner has established, by a preponderance of the evidence, that at the time of the invention of the '402 patent, claim 1 would have been obvious over the combination of Coronel and Fox.

### 3.     Analysis of independent claims 8 and 15

Independent claim 8 recites a system for fault detection and independent claim 15 recites an apparatus for fault detection. Ex. 1001, 8:1–30, 8:55–9:2. Petitioner contends that "[t]he method of [c]laim 1 is implemented using the system and apparatus of claim 8 and 15, respectively." Pet. 51. Petitioner provides a detailed element by element comparison showing how the elements of claim 1 correspond to the elements

47

IPR2021-01340
Patent 6,725,402 B1

of claims 8 and 15. *Id.* at 52–57. Petitioner then asserts that claims 8 and 15 would have been obvious for the same reasons as claim 1. *Id.*

Patent Owner agrees that claims 8 and 15 are analogous to claim 1. PO Resp. 24 ("Independent claims 8 and 15 recite, respectively, a system and apparatus for fault detection that include elements analogous to those of claim 1."). Patent Owner argues that Petitioner's arguments for claim 8 "share the same weaknesses" as its arguments for claim 1. *Id.* at 25. More specifically, Patent Owner argues that Petitioner's arguments for claim 8 fail because "as shown above [referencing its arguments with respect to claim 1] Coronel's computer cannot be both an interface and a data collection unit, neither Fox nor Coronel disclose data translation or sending of translated data, and neither Fox nor Coronel disclose a fault detection unit." *Id.*

Patent Owner's summary of its arguments does not align perfectly with the arguments it actually made with respect to claim 1. For example, Patent Owner argued that Coronel's computer could not be both a "first interface" and an "advanced process control," not that it could not be "both an interface and a data collection unit." *See* PO Resp. 20–21. Similarly, Patent Owner did not challenge that Coronel discloses a fault detection unit, i.e., its supervisor. *See generally, id.* Nonetheless, it is clear that in its discussion of claim 8, Patent Owner intended to rely on the arguments already made, not to make new arguments. We deem Patent Owner's imprecise summary to be harmless error and find Patent Owner to have incorporated and applied all of the arguments it made with respect to claim 1 in its discussion of claim 8.

48

For the reasons discussed with respect to claim 1, we do not find these arguments persuasive. We find that Petitioner has shown, by a preponderance of the evidence, that the combination of Coronel and Fox teaches each of the elements of claim 8.

With respect to claim 15, Patent Owner argues that "Petitioner compounds the weaknesses in its arguments for claims 1 and 8 by arguing that the 'controller' in claim 15 is equivalent to the computer ***and*** the supervisor of Coronel at the same time as the computer operates as both the first interface and the APC framework." PO Resp. 25. The relevant portion of claim 15 recites a "a controller adapted to: . . . determine if a fault condition exists with the processing tool . . . ; and perform a corrective action." Ex. 1001, 8:59–65. We do not find any basis in the claim language why the "controller" cannot be comprised of two separate components – in this case Coronel's supervisor and its computer. Nor do we find any reason why the computer cannot have both a first interface and a portion that acts as an APC framework.[12] *See supra* § II.E.2.i (discussing the computer acting as both an interface and an APC).

In addition to this argument, we understand Patent Owner to have incorporated the arguments in made with respect to claim 1 as applying to claim 15. For the reasons discussed with respect to claim 1, we do not find these arguments persuasive. We find that Petitioner has shown, by a

---

[12] Patent Owner's makes a similar argument for claim 18. PO Resp. 25–26. We assume this to be a typographical error because the '402 patent only includes up to claim 17. We understand Patent Owner's argument for claim 18 to apply to claim 15.

49

IPR2021-01340
Patent 6,725,402 B1

preponderance of the evidence, that the combination of Coronel and Fox teaches each of the elements of claim 15.

### 4.     Dependent claims 6, 11, and 17

Claims 6 ultimately depends from claim 1, and additionally requires that "comparing comprises comparing the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within accept able operational limits." Ex. 1001, 7:57–61. Claim 11 ultimately depends from claim 8, and recites essentially the same additional limitation as claim 6. *Id.* at 8:40–44. Claim 17 includes a similar, although not identical, limitation. It depends from claim 15 and additionally requires that the "controller is adapted to compare at least a portion of the operational data to model data to determine if a fault condition exists." *Id.* at 10:1–3.

Petitioner contends that the combination of Coronel and Fox discloses the additional limitations of claims 6, 11, and 17. Pet. 60–61. We agree.

Coronel discloses that a "preliminary but essential step" of its method is to "establish an adequate database." Ex. 1006, 9:54–55. Coronel's database is comprised of "data relative to the evolution of selected process parameters during a determined step of the wafer fabrication process when this step takes place normally and . . . in the case of identified deviations." *Id.* at 9:58–10:5. This data is used by "process engineers" to "define a set of analysis rules that permit to characterize these deviations and establish corresponding rejection criteria." *Id.* at 10:7–10. The rules are "coded in the form of algorithms that are also stored in the database" and that are

50

IPR2021-01340
Patent 6,725,402 B1

"adapted to subsequently monitor said selected process parameters . . . and detect any identified deviations." *Id.* at 10:10–14. Thus, Coronel discloses the use of data, derived from a step of the wafer fabrication process that takes place normally, as a reference for comparison to determine whether a fault has occurred.

Similarly, Fox discloses obtaining a "bench mark" of "baseline numbers" by processing a "statistically acceptable number of wafers in order to collect the mean, variance and covariance values for . . . eleven RF components."[13] Ex. 1005, 6:12–15; *see also id.* at 6:8–11 ("The ideal Hotelling's $T^2$ values for a process are determined by running a number of samples and developing a baseline for that particular process"). "The parameter(s) which are used to measure the test wafers to develop the $T^2$ values is a design choice." *Id.* at 6:29–31. "[A]fter all test wafers are run and component values recorded, . . . n sets of values are used to calculate $\mu_0$ for each component." *Id.* at 6:20–22. "Once the established baseline number of wafers are run, a baseline will exist in which the $T^2$ value can be calculated for each periodic time interval" and "the UCL and the LCL limits can be established for each time period." *Id.* at 6:60–65. The baseline numbers are stored in memory and used to "control the ongoing process of a production wafer." *Id.* at 7:5–7. Thus, like Coronel, Fox discloses the use of data, derived prior wafer fabrications, as a reference for comparison to determine whether a fault has occurred.

---

[13] The eleven RF component values are values from an RF sensor monitoring a plasma processing tool. Ex. 1005, 2:35–37, 47–52, 67–3:14.

51

IPR2021-01340
Patent 6,725,402 B1

In view of these teachings, we agree with Dr. Hatalis that combining Coronel and Fox would have led a POSA to "compar[e] the operational state data to predetermined state data that would be derived from other similar-type wafers known to be processed within acceptable operational limits," and that the POSA would reasonably have expected success in doing so.  Ex. 1002 ¶¶ 120–121.  We address Patent Owner's arguments below.

Much of the argument in Patent Owner's Response focused on MRF, MAF, and TAF files.[14]  Patent Owner explained at length how MRFs, MAFs, and TAFs are used in an embodiment of the '402 patent. PO Resp. 8–11.  Patent Owner then argued that Coronel does not disclose "the creation of the MRF, MAF and TAF files that could be construed as state data or their comparison to fault model data."  *Id*. at 12.

We do not find this persuasive.  On its face, the language of claims 6, 11, and 17 does not require any particular type of "fault model data," and Patent Owner has not asked us to construe the term as limited to models that use MRFs, MAFs, and/or TAFs.[15]  In addition, Mr. Humphrey confirmed

---

[14] A model reference file (MRF) "provides the current state of the tool 105 on a near real-time basis for each wafer that is being processed."  Ex. 1001, 3:60–62.  A model archive file (MAF) is a compilation of the MRF for each wafter of a completed lot.  *Id*. at 3:62–65.  A tool alarm file (TAF) is prepared by comparing the MRF of a wafer currently being produced to fault model data, provided that the [MRF] data differs from the fault model data by a predetermined amount.  *Id*. at 3:65–4:3.

[15] The '402 patent states that descriptions of Figure 2 regarding MRF, MAF, and TAF files are made "[i]n accordance with ***one embodiment*** [in which] the server 205 runs ModelWare®, a commercially available software

52

IPR2021-01340
Patent 6,725,402 B1

that the claims do not require MRFs, MAFs, or TAFs.  Ex. 1040, 106:2–107:11.  In its Sur-reply, Patent Owner backed away from this argument asserting, "[Patent Owner] has never claimed that the MRFs disclosed in the '402 Patent are the only type of fault model data, or that other fault models do not fall within the claims of the '402 Patent," explaining that "the comparison of MRFs and MAFs to fault model data is exemplary and indicative of how a [POSA] would conceive of fault model data or model data."  Sur-reply 13; *see also* Tr. 24 (Patent Owner's counsel conceding that model data does not need to be a MRF, MAF, or TAF file).  With this clarification in mind, it is clear that the absence of MRFs, MAFs, and/or TAFs does not preclude Coronel from disclosing fault model data.

Patent Owner argues that "Coronel's singular reference to predictive maintenance (i.e. 'In turn, the "batch history" of a plurality of batches can be exploited, in particular for statistics purposes, for instance for preventive/predictive maintenance'; see Ex. 1006 at [0038] 2-5)[16] points to statistical control methods, not a model-based approach."  PO Resp. 12.  We do not find this argument persuasive.  As discussed above, Coronel describes preparing a model for "selected process parameters during a determined step

---

package that provides fault detection analysis" and makes clear that "other types of fault detection software may also be used in lieu of ModelWare® without departing from the spirit and scope of the present invention."  Ex. 1001 at 3:45-56, *see also id.* at 4:64–5:2, 5:52–58, 6:30–35.  This supports that, had Patent Owner sought such a limiting construction, it would not have found support in the specification.

[16] This citation appears to be incorrect.  The quoted language appears in paragraph 40 of Coronel.  Ex. 1006, 11:2–5.

53

of the wafer fabrication process." Ex. 1006, 9:57–10:5. This model is separate from the "batch history" that Patent Owner argues points to a statistical analysis. The "batch history" is the "sum of the 'wafer history' of all of the wafers of a batch." *Id.* at 10:58–11:2. The "wafer history," in turn, is the "sum of all the step reports for a determined process and a determined wafer." *Id.* at 10:55–57. And the "step report" is "[a]ll the important data that are representative of the processing for [a particular] step." *Id.* at 10:52–55. We do not read Coronel's disclosure that its batch report can be used for statistical purposes to support (*id.* at 11:2–5) to support that Coronel does not create a model derived from normal fabrication processes to detect faults (*id.* at 9:54–10:24).

With respect to Fox, Patent Owner argues: "Fox . . . discloses the application of statistical analysis to a single process parameter," using Hotelling's $T^2$ algorithm to process RF component values. PO Resp. 11. At oral argument, counsel for Patent Owner elaborated on this argument, explaining that Fox's $T^2$ value was a "data point" and lacked sufficient granularity to constitute a model. Tr. 22–23. We do not find this persuasive because the language of claims 6, 11, and 17 does not require the model data to have any particular level of complexity. And Patent Owner has not asked us to construe the term "fault model data" or "model data" as requiring a model of any particular complexity. Moreover, we do not see any reason why a baseline $T^2$ value derived from eleven sensor measurements, as disclosed in Fox (Ex. 1005, 8:18–21), would not constitute a model. To the contrary, we find that Fox teaches a model. *See e.g.,* Ex. 1005, 6:12–28.

IPR2021-01340
Patent 6,725,402 B1

Patent Owner also argues that Fox does not disclose fault model data because it "does not mention tool health or machine health, which a [POSA] would have understood as a determination made based on process modelling and the use of fault model data." PO Resp. 12. We do not find this persuasive because the language of claims 6, 11, and 17 does not require the use of model data include tool health or machine health. And Patent Owner has not asked us to impose such a limiting construction. Moreover, the example of a baseline $T^2$ value derived from eleven measurements of a plasma etching tool (Ex. 1005, 2:35–37, 47–52, 67–3:14, 8:18–21), as disclosed in Fox, relates to the health of that plasma etching tool.

> Patent Owner argues:

> Petitioner identifies nothing in either Coronel or Fox that teaches ***comparison to a fault model*** as taught by the '402 Patent. Instead, Petitioner cites to examples of "rules for rejection criteria that are coded into algorithms" in Coronel and "benchmarking" in Fox, together with comparison of process data to those rules or benchmarks, and ***infers*** that these types of monitoring involves the use of models. Petitioner presents no explicit evidence that such models were contemplated in either reference, and presents no expert testimony that would suggest that "fault models" are somehow implicit[l]y present in either disclosure.

Sur-reply 14. We do not find this argument persuasive.

We acknowledge that Coronel and Fox do not use the term "model." But the law does not require *ipsissimis veris* disclosure. *In re Bond,* 910 F.2d 831, 832–33 (Fed. Cir. 1990). And both Coronel and Fox compare what is happening in real time in a wafer fabrication process to a data derived from prior wafer fabrications to identify faults. In Coronel, the comparison is to "analysis rules" that are "coded in the form of algorithms."

IPR2021-01340
Patent 6,725,402 B1

Ex. 1006, 10:7–11.  In Fox, the comparison is to "ideal Hotelling's T2 values" obtained using a "bench mark" of "baseline numbers."  Ex. 1005, 6:8–15.  The data used in the comparisons in Coronel and Fox is similar to what is described and claimed in the '402 patent.  For example, the specification of the '402 patent states: "The fault model data includes model reference files (MRFs) derived from the tool state data of other similar-type wafers, where it was previously known that such wafers that were processed by the tool within acceptable operational limits."  Ex. 1001, 4:3–8, 7:57–61, 8:40–44.  We find that the data used in Coronel's and Fox's comparisons is fault model data.

In addition, as discussed above, we credit Dr. Hatalis's testimony that combining Coronel and Fox would have led the POSA to "compar[e] the operational state data to predetermined state data that would be derived from other similar-type wafers known to be processed within acceptable operational limits."  Ex. 1002 ¶ 120.  We find that data derived from wafers known to be processed acceptably and used as a comparator to identify faults meets the claim requirement for "fault model data" and/or "model data."  Patent Owner's argument that the doctrine of claim differentiation compels a different conclusion (Sur-reply 14) is unpersuasive the doctrine does not support that the claims must be interpreted such data "derived from other similar-type wafers, where it was previously known that such wafers were processed within accept able operational limits" and used as a comparator is something other than fault model data.

Patent Owner argues that "objective evidence indicates that at least claims 6, 11 and 17 of the '402 Patent [were] novel and not obvious at the

56

IPR2021-01340
Patent 6,725,402 B1

time of its conception." PO Resp. 17.[17]  Patent Owner argues that at the time of conception the head of Sematech, a "well known-consortium of U.S.-based semiconductor manufacturers," stated that "***[t]he goal of sensor-based process control is to provide real time fault detection and model based operation of process tools***" but, at the same time, acknowledged that "[t]his community's assessment is that ***no sensor-based process control capability is fully-compliant with these protocols and standards***." *Id.* at 16 & n.2 (citing Ex. 2040 ¶¶ 54, 56) (alterations in original).  Patent Owner contends that "the '402 Patent fulfilled [this] vision." *Id.*

Patent Owner does not specify which objective indicia this evidence supports, complicating our ability to evaluate Patent Owner's argument.  We interpret it as most analogous to long-felt need and we address it as such.  To establish a long-felt need, three elements must be proven: First, the need must have been a persistent one that was recognized by ordinarily skilled artisans.  *In re Gershon*, 372 F.2d 535, 538 (CCPA 1967).  Second, the long-felt need must not have been satisfied by another before Patent Owner's invention.  *See Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).  Third, the invention must, in fact, satisfy the long-felt need. *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971).

We begin by considering whether there was a persistent need recognized in the art.  Mr. Humphrey testifies that the claimed methods and

---

[17] Patent Owner does not argue objective indicia with respect to the other challenged claims.  Accordingly, we consider objective indicia only with respect to claims 6, 11, and 17.

57

IPR2021-01340
Patent 6,725,402 B1

systems addressed an "industry-wide expressed need for integrated solutions to semiconductor manufacturing fault detection and model based operation of process tools." Ex. 2040 ¶ 56. As support, Mr. Humphrey relies on Ex. 2043, an article published in 1998, titled, "Metrology Needs for the Semiconductor Industry Over the Next Decade," which states: "The goal of sensor-based process control is to provide real time fault detection and model based operation of process tools." Ex. 2043, 15 (cited at Ex. 2040 ¶ 54). This provides some support for the existence of a need for real time fault detection and model-based operation of semiconductor manufacturing processes at the time of the article, i.e., in 1997.

We next consider whether this need was satisfied by another before Patent Owner's invention. To established that the need for model-based operations had not been satisfied by another, Patent Owner and Mr. Humphrey rely on the following passage from Ex. 2043:

> Presently, the conversion to 300 turn wafer capable tools is driving much of the factory control protocol and standardization activities for Advanced Process Control (APC)/Advanced Equipment Control (AEC). This community's assessment is that no sensor-based process control capability is fully compliant with these protocols and standards.

*Id.* at 15. This passage supports that the industry was not yet fully compliant with "factory control protocol and standardization activities for Advanced Process Control (APC)/Advanced Equipment Control (AEC)." *Id.* However, it is not clear from the record precisely what aspect of the "factor control protocol and standardization activities" the industry has been yet to comply with. Based on the context provided by the article, we infer that the factory control protocol and standardization activities that the industry has

58

IPR2021-01340
Patent 6,725,402 B1

not yet complied with includes model-based operation of process tools.  *Id.*
However, the record does not enable us to determine whether there are other
aspects of the protocol and standardization activities that industry has yet to
comply with.  This diminishes the weight of Patent Owner's evidence that
the long-felt need it identified had yet to be satisfied at the time of the
claimed invention.[18]

Finally, we consider whether the method, system, and apparatus of
claims 6, 11, and 17 satisfy the identified need.  Here we credit the
unrebutted testimony of Mr. Humphrey that the "innovative methods and
systems disclosed in the '402 patent and depicted in Figures 1, 2, 3, 4A and
4B address the industry-wide expressed need for integrated solutions to
semiconductor manufacturing fault detection and model based operation of
process tools."  Ex. 2040 ¶ 56.

Considering all of the evidence and arguments with respect to
objective indicia of non-obviousness, we find some support for the existence
of a long-felt need for real time fault detection and model-based operation of
semiconductor manufacturing processes.  However, we give this factor only
modest weight.

Considering the totality of the evidence regarding claims 6, 11, and
17, including objective indicia of non-obviousness, we find that Petitioner
has established, by a preponderance of the evidence, that claims 6, 11, and
17 would have been obvious over the combination of Coronel and Fox.

---

[18] To simplify our analysis, we assume that neither Coronel nor Fox
addressed the need identified by Patent Owner.

59

### 5.    Dependent claims 2–5, 7, 9, 12–14, and 16

Petitioner contends that the combination of Coronel and Fox teaches or suggests each element of claims 2–5, 7, 9, 12–14, and 16, and sets forth an element-by-element comparison of the asserted art to the challenged claims. Pet. 57–63. Beyond challenging Petitioner's showing with respect to claim limitations common to independent claims 1, 8, and 15, Patent Owner does not challenge any aspect of Petitioner's showing with respect to claims 2–5, 7, 9, 12–14, and 16. PO Resp. 26. Having reviewed the argument and evidence of record, we find that Petitioner has shown by a preponderance of the evidence that claims 2–5, 7, 9, 12–14, and 16 would have been obvious over the combination of Coronel and Fox.

## III.    PETITIONER'S MOTION TO STRIKE

Petitioner moves to strike seven categories of evidence and argument. Mot. 1–12. We address each category in turn.

### A. *Alleged new evidence and arguments regarding SECS II*

In its Sur-reply, Patent Owner cites to a URL[19] to support its new argument that ASCII is a data type and, by implication, not a communication protocol. Sur-reply 8. Petitioner moves to strike the argument relying on the previously unidentified URL. Mot. 2–4.

For the reasons discussed *supra* § II.E.2.d, we find that the argument that the URL is cited as supporting is a new argument. As also discussed

_____

[19] https://www.einnosys.com/integrationservices/robot-smif-integration/semi-equipment-communications-standard-2/

IPR2021-01340
Patent 6,725,402 B1

*supra* § II.E.2.d, even if we were to consider this argument we would not find it persuasive. Petitioner's motion is thus substantively moot. However, we do not dismiss the argument as moot because we find merit in Petitioner's argument that Patent Owner did not follow the requirements of 37 C.F.R. § 42.63, which unequivocally states that "[a]ll evidence **must** be filed in the form of an exhibit." Patent Owner's failure to follow this procedure is problematic because, as Petitioner points out in its Motion to Exclude, "a URL is subject to change at any given point in time." Mot. Excl. 3.[20] As the content of the URL is transitory, dismissing Petitioner's motion as moot would leave ambiguity in our record.

In its Opposition to Petitioner's Motion to Exclude, Patent Owner suggests that the problem that its URL is transitory can be cured if we permit it to file the URL as an exhibit or if we enter it as a Board Exhibit ourselves. *Id.* at 3. But our rules prohibit submission of any new evidence other than deposition transcripts of the cross-examination of any reply witness. *See* 37 C.F.R. § 42.23(b); CTPG at 73-74. We decline Patent Owner's invitation to use its violation of our rule requiring all evidence to be entered as exhibits (37 C.F.R. § 42.63) as justification for allowing it to circumvent our rule prohibiting the submission of new evidence with sur-replies (37 C.F.R. § 42.23).

---

[20] Given the overlapping subject matter, we find it helpful to consider both parties' arguments made in connection with the Motion to Exclude together with the arguments in connection with the Motion to Strike.

61

IPR2021-01340
Patent 6,725,402 B1

Accordingly, we grant Petitioner's motion to exclude the URL cited at page 8 of Patent Owner's Sur-reply. We do not strike the argument that the URL is cited as supporting, however, we note that absent citation to the stricken URL, such argument lacks evidentiary support.

### B. Alleged new arguments regarding "translation"

Petitioner argues that Patent Owner "never disputed that translation includes conversion from ASCII format to SECS II format, or $T^2$ numerical values to SECS II" and did not "question that a POSA would have understood the need for translation when combining the teachings of Coronel with Fox." Mot. 4. We agree. *See* PO Resp. 21–23 (addressing Petitioner's proof on the translation element). However, we have already determined that Patent Owner waived these arguments and that even if we were to consider them, they are not persuasive. *See supra* § II.E.2.d. Accordingly, we dismiss Petitioner's motion to strike these arguments as moot.

### C. Alleged undisclosed argument regarding objective indicia

Petitioner argues that Patent Owner's Sur-reply cites to a portion of Exhibit 2043 that was never previously cited or discussed. Mot. 5. In its Reply, Petitioner argued that the portions of Ex. 2043 cited by Patent Owner in the POR related only to 300mm wafer tools. Pet. Reply 20. In its Sur-reply, Patent Owner quoted from a separate portion of Ex. 2043. Sur-reply 16. Patent Owner explains that this quotation was justified to show that "***the rest of the relevant section of the article*** makes it clear that sensor-based process control ***had not yet been implemented across all relevant***

62

IPR2021-01340
Patent 6,725,402 B1

*sectors* of semiconductor production at the time." Mot. Opp. 8. We agree with Patent Owner that this citation was reasonably responsive to the argument made by Petitioner in its Reply. Accordingly, we deny Petitioner's motion to strike this argument.

### D. Alleged belated argument addressing district court claim construction orders

Petitioner argues that Patent Owner's Sur-reply "asserts for the first time that Coronel does not disclose the run-to-run control required in the construction of the term 'advanced process control framework' by the Eastern District of Texas. Mot. 7. Patent Owner argues that the claim construction arguments in its Sur-reply are merely responsive to Petitioner's claim construction. Mot. Opp. 4. We discussed this issue *supra* § II.E.2.h, concluding that Petitioner's submission of a district court claim construction, as contemplated by the CTPG, did not open the door to Patent Owner's belated claim construction arguments, including the argument that Coronel does not disclose run-to-run control as purportedly required by the term "advanced process control framework." Because we did not consider Patent Owner's belated claim construction argument, or any related factual arguments, there is no need to strike them. Accordingly, we dismiss as moot Petitioner's motion to strike this argument.

### E. Alleged new arguments regarding fault detection by the APC

Petitioner argues that Patent Owner's argument that an APC framework must include software components for fault detection is a new

63

IPR2021-01340
Patent 6,725,402 B1

argument that was not included in Petitioner's Reply.  We agree.  *See* PO Resp. 17–20 (addressing the limitation including the "advanced process control" term without making this argument).  However, we have already determined that Patent Owner waived these arguments and that even if we were to consider them, they are not persuasive.  *See supra* § II.E.2.h. Accordingly, we dismiss Petitioner's motion to strike these arguments as moot.

### F. *Alleged undisclosed argument regarding superfluous claim construction*

For the claim limitation requiring "sending a signal by the framework to the first interface reflective of the predetermined action," Petitioner points to one portion of Coronel's computer as the "framework" (i.e., the ACP), and another portion of Coronel's computer as the "first interface."  Pet. 50. In its Response, Patent Owner points out that Petitioner's position has the computer functioning as both the APC and the first interface and argued that "[i]t is simply illogical that the computer 12 of Coronel would send a signal *to itself* reflective of information that it already possesses."  PO Resp. 21.  In its Sur-reply, Patent Owner argued: "Because claims should not be construed so as to render terms superfluous, Petitioner's assertion that sending an 'alert code *to the computer*' meets 'sending a signal by the [APC] framework *to the first interface* reflective of the predetermined action' is factually and legally incorrect."  Sur-reply 7.  Petitioner moves to strike this as a new argument.  Mot. 10–11.  We deny Petitioner's motion to strike this argument because we agree with Patent Owner that its superfluous argument is

64

IPR2021-01340
Patent 6,725,402 B1

"simply another way of saying the same thing" – i.e., that it would be illogical for the computer so send a signal to itself. Mot. Opp. 11. Thus, we do not consider it a new argument.

### G. Alleged undisclosed argument differentiating "fault model data" from "model data"

Petitioner argues that in its Response, Patent Owner treated the terms "fault model data" recited in claims 6 and 11 and the term "model data" recited in claim 17 as equivalent. Mot. 11. We agree that Patent Owner treated these terms as equivalent. *See* PO Resp. 7–17. Petitioner then argues that Patent Owner makes a new argument attempting to differentiate "model data" from "fault model data." Mot. 12. We do not agree because we do not understand Patent Owner to be arguing that "fault model data" and "model data" are different for purposes of this proceeding. Sur-reply 14–15. Rather, we understand Patent Owner to argue that the terms "fault model data" and "model data" (as recited in claims 6, 11, and 17) are different from "predetermined state data" (as recited in claims 5 and 10). Thus, we do not consider Patent Owner's Sur-reply arguments to reflect a change in position. Accordingly, we deny Petitioner's motion to strike these arguments.

65

IPR2021-01340
Patent 6,725,402 B1

## IV.    PETITIONER'S MOTION TO EXCLUDE

In its Sur-reply, Patent Owner cites to a URL[21] to support its new

argument that ASCII is a data type and, by implication, not a communication

protocol.  Sur-reply 8.  Petitioner filed a Motion to Exclude, arguing that the

URL should be excluded because "the Board's Rules, the CTPG, and Board

precedent . . . prohibit submission of any new evidence other than deposition

transcripts of the cross-examination of any reply witness."  Mot. Excl. 1.

We discussed this issue *supra* § III.A in connection with Patent Owner's

Motion to Strike and struck the offending URL.  Because the URL has

already been stricken, we dismiss Petitioner's Motion to Exclude as moot.

## V.    CONCLUSION[22]

For the reasons discussed above, we find that Petitioner's has

established, by a preponderance of the evidence, that claims 1–17 of the

'402 patent would have been obvious over the combination of Coronel and

Fox.  We dismiss-in-part as moot, grant-in-part, and deny-in-part,

---

[21] https://www.einnosys.com/integrationservices/robot-smif-integration/
semi-equipment-communications-standard-2/
[22] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding*.  *See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

66

IPR2021-01340
Patent 6,725,402 B1

Petitioner's Motion to Strike.  We dismiss Petitioner's Motion to Exclude as moot.

In Summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|--------|-------------|--------------------|---------------------------|-------------------------------|
| 1–17 | 103(a) | Coronel, Fox | 1–17 | |

VI.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Petitioner has proved by a preponderance of the evidence that claims 1–17 of U.S. Patent No. 6,725,402 B1 are unpatentable;

FURTHER ORDERED that Petitioner's motion to strike is granted in part, denied in part and dismissed in part as moot;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot; and

FURTHER ORDERED that parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.


For PETITIONER:

Eric Krause
ekrause@axinn.com
Christopher Gallo
cgallo@axinn.com
AXINN, VELTROP & KARKRIDER LLP

For PATENT OWNER:

67

IPR2021-01340
Patent 6,725,402 B1

Timothy Devlin
TD-PTAB@devlinlawfirm.com
Alex Chan
achan@devlinlawfirm.com
Joel Glazer
Jglazer@devlinlawfirm.com
DEVLIN LAW FIRM LLC

68



US006725402B1

(12) **United States Patent**
Coss, Jr. et al.

(10) Patent No.: **US 6,725,402 B1**
(45) Date of Patent: **Apr. 20, 2004**

(54) **METHOD AND APPARATUS FOR FAULT DETECTION OF A PROCESSING TOOL AND CONTROL THEREOF USING AN ADVANCED PROCESS CONTROL (APC) FRAMEWORK**

(75) Inventors: **Elfido Coss, Jr.**, Austin, TX (US); **Qingsu Wang**, Austin, TX (US); **Terrence J. Riley**, Austin, TX (US)

(73) Assignee: **Advanced Micro Devices, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 556 days.

(21) Appl. No.: **09/629,073**

(22) Filed: **Jul. 31, 2000**

(51) Int. Cl.⁷ ................................................ G06F 11/00
(52) U.S. Cl. .......................... **714/48**; 700/109; 700/95; 714/742
(58) Field of Search ............................. 714/4, 48, 742; 700/109, 139, 95; 438/14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,661,669 A | 8/1997 | Mozumder et al. | 364/552 |
| 5,740,062 A | 4/1998 | Berken et al. | 364/478.06 |
| 5,859,964 A | 1/1999 | Wang et al. | 395/185.01 |
| 6,061,640 A * | 5/2000 | Tanaka et al. | 702/81 |
| 6,115,643 A * | 9/2000 | Stine et al. | 700/110 |
| 6,161,054 A * | 12/2000 | Rosenthal et al. | 700/121 |
| 6,232,134 B1 * | 5/2001 | Farber et al. | 438/9 |
| 6,263,255 B1 * | 7/2001 | Tan et al. | 700/121 |
| 6,314,385 B1 * | 11/2001 | Kim et al. | 702/184 |

| | | | |
|---|---|---|---|
| 6,315,574 B1 * | 11/2001 | Kamieniecki et al. | 439/16 |
| 6,336,055 B1 * | 1/2002 | Cho | 700/121 |
| 6,408,399 B1 * | 6/2002 | Baughman | 714/4 |
| 6,532,555 B1 * | 3/2003 | Miller et al. | 714/48 |
| 6,546,508 B1 * | 4/2003 | Sonderman et al. | 714/48 |
| 6,556,881 B1 * | 4/2003 | Miller | 700/108 |
| 6,606,582 B1 * | 8/2003 | Brinkman et al. | 702/188 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 01/18623 A1 | 3/2001 | G05B/19/418 |
| WO | WO 01/25865 A1 | 4/2001 | G05B/19/418 |

OTHER PUBLICATIONS

International PCT Search Report dated July 3, 2001 (PCT/US01/21159; TT3217–PCT).

* cited by examiner

*Primary Examiner*—Scott Baderman
*Assistant Examiner*—Anne L. Damiano
(74) *Attorney, Agent, or Firm*—Williams, Morgan & Amerson, P.C.

(57) **ABSTRACT**

A method and apparatus for providing fault detection in an Advanced Process Control (APC) framework. A first interface receives operational state data of a processing tool related to the manufacture of a processing piece. The state data is sent from the first interface to a fault detection unit. A fault detection unit determines if a fault condition exists with the processing tool based upon the state data. A predetermined action is performed on the processing tool in response to the presence of a fault condition. In accordance with one embodiment, the predetermined action is to shutdown the processing tool so as to prevent further production of faulty wafers.

**17 Claims, 5 Drawing Sheets**





**Figure 1**

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 2 of 11



**Figure 2**

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 3 of 11



**Figure 3**

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 4 of 11



Obtain Operational Tool State Data of Processing Tool
410
Tool State Data is Received at EI and Accumulated in Data Collection Unit
420
Translate Tool State Data from a First Communications Protcol to a Second Communications Protocol in a Tool Data File
430
Send Tool Data File From Data Collection Unit to Fault Detection System
440
Create MRF, MAF, TAF, and Compareto Fault Model Data to Determine Tool Health Data of the Processing Tool
450
A

Figure 4A



Forward Tool Health Data to Plan Executor of APC
Framework
<u>460</u>

Plan Executor of APC Framework Inspects
Tool Health Data for a Fault Condition
<u>470</u>

Plan Executor of APC Framework Performs a
Predetermined Action Based Upon Results of Tool
Health Data
<u>480</u>

# Figure 4B

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 6 of 11

US 6,725,402 B1

**1**

# METHOD AND APPARATUS FOR FAULT DETECTION OF A PROCESSING TOOL AND CONTROL THEREOF USING AN ADVANCED PROCESS CONTROL (APC) FRAMEWORK

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to semiconductor fabrication technology, and, more particularly, to a method and apparatus for fault detection and control of a processing tool using an Advanced Process Control (APC) framework.

### 2. Description of the Related Art

There is a constant drive in the semiconductor industry to increase the quality, reliability, and throughput of integrated circuit devices such as microprocessors, memory devices and the like. This drive is fueled by consumer demands for higher quality computers and electronic devices that operate more reliably.

These demands by the consumer have resulted in some improvements in the manufacture of semiconductor devices as well as in the manufacture of integrated circuit devices incorporating such semiconductor devices. Reducing defects in the manufacture of these devices lowers the cost of the devices themselves. Accordingly, the cost of the final product incorporating these devices is also reduced, thus providing inherent monetary benefits to both the consumer and manufacturer.

Although there has been an improvement in detecting faults associated with semiconductor manufacturing processes, one problem currently encountered by the semiconductor manufacturing industry is the delay in reporting these faults before corrective measures can be implemented in a more expedient manner. As a result of this delay, several faulty devices are produced, which undesirably increases costs for the manufacturer and consumer.

The present invention is directed to overcoming, or at least reducing the effects of, one or more of the problems set forth above.

## SUMMARY OF THE INVENTION

In one aspect of the present invention, a method is provided for fault detection in a manufacturing process. The method includes receiving at a first interface operational state data of a processing tool related to the manufacture of a processing piece. The state data is sent from the first interface to a fault detection unit. It is determined if a fault condition exists with the processing tool based upon the state data, and a predetermined action is performed on the processing tool in response to the presence of a fault condition.

In another aspect of the present invention, a system is provided for fault detection in a manufacturing process. The system includes a processing tool adapted to manufacture a processing piece and a first interface, coupled to the processing tool, which is adapted to receive operational state data of the processing tool related to the manufacture of the processing piece. The system further includes a fault detection unit adapted to determine if a fault condition exists with the processing tool based on the operational state data, and a framework adapted to perform a predetermined action on the processing tool in response to the presence of a fault condition.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may be understood by reference to the following description taken in conjunction with the accom-

**2**

panying drawings, in which like reference numerals identify like elements, and in which:

FIG. **1**. illustrates a manufacturing system that includes a fault detection system and Advanced Process Control (APC) framework for providing fault detection and control of a processing tool in accordance with one embodiment;

FIG. **2** depicts the detail of the fault detection system of FIG. **1**;

FIG. **3** shows a more detailed perspective of the APC framework of FIG. **1** for controlling the operation of the processing tool; and

FIGS. **4**A and B show a process for providing fault detection capability for the manufacturing system of FIG. **1** and control thereof.

While the invention is susceptible to various modifications and alternative forms, specific embodiments thereof have been shown by way of example in the drawings and are herein described in detail. It should be understood, however, that the description herein of specific embodiments is not intended to limit the invention to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the invention as defined by the appended claims.

## DETAILED DESCRIPTION OF SPECIFIC EMBODIMENTS

Illustrative embodiments of the invention are described below. In the interest of clarity, not all features of an actual implementation are described in this specification. It will of course be appreciated that in the development of any such actual embodiment, numerous implementation-specific decisions must be made to achieve the developers' specific goals, such as compliance with system-related and business-related constraints, which will vary from one implementation to another. Moreover, it will be appreciated that such a development effort might be complex and time-consuming, but would nevertheless be a routine undertaking for those of ordinary skill in the art having the benefit of this disclosure.

Turning now to the drawings, and specifically referring to FIG. **1**, a system **100** for determining fault detection in a semiconductor fabrication process based on process tool operational state data is provided. The system **100** includes a processing tool **105**, which in the illustrated embodiment, is in the form of semiconductor fabrication equipment used to produce a processing piece, such as a silicon wafer. The processing tool **105**, in accordance with one embodiment, is an Applied Materials (AMAT) Rapid Thermal Processing (RTP) tool. It will be appreciated, however, that the processing tool **105** need not necessarily be limited to an AMAT RTP tool, or even to a tool for processing silicon wafers, but could include other types of manufacturing equipment for producing a variety of different types of commercial products without departing from the spirit and scope of the present invention.

The processing tool **105** is coupled to an equipment interface (El) **110**, which retrieves various tool state data from the tool **105**, and communicates this data to a fault detection system **120** via the data collection unit **130** to determine whether the tool **105** is experiencing a faulty operation. The tool state data may include, but is not necessarily limited to, temperature, pressure, and gas flow measurements of the processing tool **105**.

An add-on sensor **115** may also be coupled to the processing tool **105** to measure additional tool state data that is

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 7 of 11

US 6,725,402 B1

3

not ascertained by the tool 105 itself. For example, the add-on sensor 115 may be used to determine whether the silicon wafer was produced within acceptable operational limits by the tool 105. Such acceptable operational limits of the tool 105 may be to produce the wafer within a certain temperature range, for example. It will be appreciated, however, that the add-on sensor 115 may be used to record various other operational state parameters, and, thus, need not be limited to the aforementioned example.

The sensor 115 may be embodied as a simple data acquisition program, such as a C++ standalone program acquiring data from a thermocouple wire, for example. Alternatively, the sensor 115 may be embodied as a full-fledged LABVIEW® application, acquiring data through multiple transducers (not shown). It will further be appreciated that the sensor 115 need not be used at all, and the fault detection system 120 could rely solely upon the tool state data forwarded from the equipment interface 110. If used, however, the sensor 115 forwards the additional tool state data to the fault detection system 120 for analysis.

A factory control system 125, such as WorkStream, for example, provides overall program control of the semiconductor fabrication process performed by the system 100. The control system 125 provides signals to the equipment interface 110 to control the processing tool 105, such as starting and stopping the operation of the tool 105, for example. When the tool 105 is operating and processing a given wafer, the tool state data is received by the equipment interface 110 and collected by a data collection unit 130 as the data is sent from the processing tool 105 while the particular wafer is being processed. The data collection unit 130 converts the tool state data into a tool data file for the particular wafer being processed, and forwards the file to the fault detection system 120 for analysis in near real-time. In one embodiment, if the process is long, the process may be broken up into parts. The data collection unit 130, when converting the tool state data into a tool data file, translates this data from a first communications protocol used by the equipment interface 110 to a second communications protocol compatible with a software running on the fault detection system 120. The process for translating the tool state data into tool data files is specific to the particular fault detection software that is operating on the fault detection system 120.

Referring now to FIG. 2, a more detailed representation of the fault detection system 120 is provided. The fault detection system 120 receives the tool data files as converted from the data collection unit 130 at a server 205. In accordance with one embodiment, the server 205 runs ModelWare®, a commercially available software package that provides fault detection analysis of the processing tool 105 based upon the tool data files that are derived from the tool state data for each wafer processed by the tool 105. It will be appreciated, however, that other types of fault detection software may also be used in lieu of ModelWare® without departing from the spirit and scope of the present invention.

For each wafer processed by the tool 105, a model reference file (MRF) 210 is constructed from the tool data file that was forwarded from the data collection unit 130. The model reference file (MRF) 210 provides the current state of the tool 105 on a near real-time basis for each wafer that is being processed. When a lot of wafers is finished being processed by the tool 105, the model reference file (MRF) 210 for each wafer of the lot is compiled into a model archive file (MAF) 215 by the server 205. The server 205 also constructs a tool alarm file 220 by comparing the model reference file (MRF) 210 of the wafer currently being

4

processed by the tool 105 to fault model data, provided that the data of the model reference file differs from the fault model data by a predetermined amount. The fault model data includes model reference files (MRFs) derived from the tool state data of other similar-type wafers, where it was previously known that such wafers that were processed by the tool within acceptable operational limits.

The types of faults that may be detected by the fault detection system 120 include processing and/or operational faults in silicon wafer fabrication. Examples of processing faults may include, but are not necessarily limited to, non-optimal preheating of the chamber, catastrophic failure where a broken wafer is detected, abnormal processed gas flow rate, temperature errors, temperature measurement drifts, etc. Some examples of operational faults detected by the fault detection system 120 may include interrupted/resumed processing, no wafer sleuth or improper wafer sleuth prior to Rapid Thermal Anneal (RTA), etc.

The fault detection system 120, upon evaluating the model reference file (MRF) 210 for the wafer currently being processed by the tool 105, sends the results of potential faults and/or proper operation of the tool 105 in the form of tool "health" data to the Advanced Process Control (APC) framework 135 (see FIGS. 1 and 2). The APC framework 135, in turn, may send control signals to the equipment interface 110 to control the processing tool 105 based upon the tool health data results forwarded from the fault detection system 120. For example, the signal sent from the APC framework 135 may be to shut down the tool 105 to prevent any additional faulty production of wafers. Data could also be sent from the APC framework 135 to inform a technician on how to rectify a faulty condition of the tool 105, if so desired. In accordance with another embodiment, the APC framework 135 may also forward a copy of the tool health data to the equipment interface 110, and the equipment interface 110 could forward the copy of the tool health data to the factory control system 125, which may average the tool health data and plot a chart of the data or averaged data for viewing by a fab technician.

Turning now to FIG. 3, a more detailed representation of the APC framework 135 is provided. The APC framework 135 is a component-based architecture comprised of interchangeable, standardized software components enabling run-to-run control of the processing tool 105. The APC framework 135 includes a machine interface (MI) 310 for interfacing the tool 105 through the equipment interface 110 to the framework 135 for providing control of the tool 105. The APC framework 135 further includes a sensor interface (SI) 320 for interfacing the add-on sensor 115 with the framework 135. In accordance with one embodiment, the sensor interface 320 may be adapted to collect the tool state data of the processing tool 105 through the sensor 115 as opposed to having the data sent directly to the fault detection system 120. In this embodiment, the tool state data from the sensor 115 is sent to the fault detection system 120 via the APC framework 135. Furthermore, although only one sensor interface 320 is shown in FIG. 3, it will be appreciated that several sensor interfaces may be included within the framework 135 without departing from the spirit and scope of the present invention.

A plan executor (PE) 330 (i.e., a process controller) manages the APC framework 135 and provides possible solutions to problems found with the tool health data that was forwarded by the fault detection system 120. The framework 135 further includes an applications interface (AI) 340 for interfacing with third-party applications that run on the fault detection system 120. In the illustrated

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 8 of 11

US 6,725,402 B1

5

embodiment, the third-party application is the ModelWare software package running on the fault detection server 205. A data channel 350 is further provided to allow for communication between the machine and sensor interfaces 310, 320, the plan executor 330, and the applications interface 340 of the APC framework 135.

The machine interface 310 couples to the equipment interface 110 to serve as an interface between the processing tool 105 and the APC framework 135. The machine interface 310 supports the setup, activation, and monitoring of the tool 105. It receives commands and status events from the equipment interface 110 and forwards this information to other components of the APC framework 135, namely the plan executor 330 and applications interface 340. Any responses that are received by the machine interface 310 from the other components of the APC framework 135 are routed to the equipment interface 110 for delivery to the processing tool 105. As previously discussed, this may include a signal from the plan executor 330 to manipulate the tool 105 if a faulty condition is detected.

The machine interface 310 also reformats and restructures the messages between the specific communications protocol utilized by the equipment interface 110 and the Common Object Request Broker Architecture Interface Definition Language (CORBA IDL) communications protocol used by the components of the APC framework 135. The manner in which the machine interface 310 performs such translation between the equipment interface-specific communications protocol and the CORBA IDL protocol of the APC framework 135 is well known to those of ordinary skill in the art. Accordingly, the specific translation process between these two formats will not be discussed herein to avoid unnecessarily obscuring the present invention.

The sensor interface 320 serves as an interface between the add-on sensor 115 and the APC framework 135. The sensor interface 320 provides setup, activation, monitoring, and data collection for the add-on sensor 115. Similar to the machine interface 310, the sensor interface 320 also reformats and restructures the messages between the specific communications protocol utilized by the sensor 115 and the CORBA IDL protocol used by the components of the APC framework 135.

The applications interface 340 supports the integration of third-party tools (e.g., commercial software packages, such as ModelWare, MatLab, and Mathematica, for example) to the APC framework 135. Typically, these third-party tools do not provide the standard CORBA IDL protocol known to the APC framework 135. Accordingly, the applications interface 340 provides the necessary translation between the communications protocol utilized by the third-party tool and the CORBA protocol used by the APC framework 135. In the illustrated embodiment, the third-party tool is the fault detection system 120 for analyzing the tool state data of the processing tool 105 that is supplied via the data collection unit 130 and the sensor 115. As previously discussed, the fault detection system 120 includes ModelWare® software for providing fault detection in the illustrated embodiment.

The plan executor 330 performs a predetermined action based upon the tool health data results that are supplied by the fault detection system 120. When the applications interface 340 receives the results from the fault detection system 120, it forwards a copy of the results to the plan executor 330. Upon inspection of the results, the plan executor 330 attempts to rectify the fault condition found with the tool 105 by performing a predetermined action. In accordance with one embodiment of the present invention, the solution to a

6

fault condition may be for the plan executor 330 to send a control signal to the machine interface 310 and equipment interface 110 to shut down the tool 105 so as to prevent further manufacturing of faulty silicon wafers. The plan executor 330, in addition to shutting down the tool 105, may also apprise a technician of any potential solutions to rectify the fault condition through an operator interface (not shown) such as a graphical user interface (GUI), for example, before the tool 105 may commence operation once again. Alternatively, the predetermined action performed by the plan executor 330 may be to forward a copy of the tool health data to the equipment interface 110, and then to forward the health data to the workstream 125.

Turning now to FIGS. 4A and 4B, a process 400 for fault detection based upon tool state operational parameters is provided. The process 400 commences at block 410 where the tool state data of the processing tool 105 is obtained. The tool state data may be obtained from the tool 105 itself or through an add-on sensor 115. In accordance with one embodiment, the tool state data may include temperature, pressure, and gas flow measurements from the processing tool 105.

Once the tool state data is obtained through the processing tool 105, the data is received at the equipment interface 110, and is accumulated in the data collection unit 130 at block 420. At block 430, the data collection unit 130 converts the tool state data received for each wafer processed by the tool 105 from a first communications protocol used by the equipment interface 110 to a second communications protocol in the form of a tool data file. The data collection unit 130, when converting the tool state data into a tool data file, translates this data into the second communications protocol that is compatible with the software package running on the fault detection system 120, which is the ModelWare software package in the illustrated embodiment. Subsequent to creating the tool data file for each wafer currently being processed by the tool 105, the data collection unit 130 forwards the tool data file to the fault detection system 120 at block 440. The fault detection server 205 of the fault detection system 120 generates a model reference file 210, adds the model reference file (MRF) to the model archive file (MAF) 215 for the lot of wafers processed, and generates a tool alarm file 220 based on the tool data file received from the data collection unit 130. The fault detection server 205 further compares the model reference file 210 for the wafer currently being processed by the tool 105 to fault model data, and generates tool health data for the wafer at block 450.

At block 460, the fault detection system 120 forwards the tool health data to the plan executor 330 of the APC framework 135 via the applications interface 340. At block 470, the plan executor 330 inspects the tool health data for the particular wafer being processed by the tool 105. At block 480, the plan executor 330 performs a predetermined action based upon the inspection. In accordance with one embodiment, the predetermined action may be to send a control signal to shut down the processing tool 105 if the tool health data is deemed faulty. In an alternative embodiment, the plan executor 330 may forward the tool health data of the tool 105 to the equipment interface 110. The equipment interface 110 would then forward the tool health data to the workstream 125, where the tool health data may be averaged and plotted on a chart for viewing by a fab technician, if so desired.

The particular embodiments disclosed above are illustrative only, as the invention may be modified and practiced in different but equivalent manners apparent to those skilled in

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 9 of 11

US 6,725,402 B1

7

the art having the benefit of the teachings herein. Furthermore, no limitations are intended to the details of construction or design herein shown, other than as described in the claims below. It is therefore evident that the particular embodiments disclosed above may be altered or modified and all such variations are considered within the scope and spirit of the invention. Accordingly, the protection sought herein is as set forth in the claims below.

What is claimed is:

1. A method comprising:

receiving at a first interface operational state data of a processing tool related to the manufacture of a processing piece;

sending the state data from the first interface to a fault detection unit, wherein the act of sending comprises:
sending the state data from the first interface to a data collection unit;
accumulating the state data at the data collection unit;
translating the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit; and
sending the translated state data from the data collection unit to the fault detection unit;

determining if a fault condition exists with the processing tool based upon the state data received by the fault detection unit;

performing a predetermined action on the processing tool in response to the presence of a fault condition; and

sending an alarm signal indicative of the fault condition to an advanced process control framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit,

wherein performing a predetermined action further comprises sending a signal by the framework to the first interface reflective of the predetermined action.

2. The method of claim 1, wherein performing a predetermined action further comprises:

shutting down the processing tool providing that a faulty condition exists.

3. The method of claim 1, further comprising:

receiving additional state data of the processing tool from a sensor that is coupled to the processing tool; and

sending the additional state data to the fault detection unit.

4. The method of claim 3, further comprising:

translating the state data from the sensor from a first communications protocol used by the sensor to a second communications protocol used by the fault detection unit.

5. The method of claim 1, wherein determining if the fault condition exists, further comprises:

comparing the state data received at the first interface to predetermined state data at the fault detection unit.

6. The method of claim 5, wherein comparing comprises comparing the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within acceptable operational limits.

7. The method of claim 1, wherein sending the accumulated state data from the data collection unit to the fault detection unit, further comprises:

sending the accumulated state data from the data collection unit to the fault detection unit while a processing piece is being processed by the tool.

8

8. A system comprising:

a processing tool adapted to manufacture a processing piece;

a first interface, coupled to the processing tool, the first interface adapted to receive operational state data of the processing tool related to the manufacture of the processing piece;

a fault detection unit adapted to determine if a fault condition exists with the processing tool based on said operational state data;

a framework adapted to perform a predetermined action on the processing tool in response to the presence of a fault condition;

wherein the first interface comprises a data collection unit adapted to receive and accumulate the state data as the data is received by the first interface, translate the state data from a first communications protocol to a second communications protocol compatible with the fault detection unit, and to send the translated state data from the data collection unit to the fault detection unit;

wherein the fault detection unit is further adapted to send an alarm signal indicative of the fault condition to the framework from the fault detection unit providing that a fault condition of the processing tool was determined by the fault detection unit; and

wherein the framework is further adapted to send a control signal to the first interface reflective of the predetermined action providing that a fault condition exists.

9. The system of claim 8, further comprising:

a sensor, coupled to the processing tool, the sensor adapted to receive additional state data from the processing tool, and to send the data to the fault detection unit.

10. The system of claim 8, wherein the fault detection unit is further adapted to compare the state data of the processing tool to predetermined state data to determine the presence of the fault condition.

11. The system of claim 10, wherein the fault detection unit is adapted to compare the state data received to fault model data that is derived from other similar-type wafers, where it was previously known that such wafers were processed within acceptable operational limits.

12. The system of claim 8, wherein the predetermined action is to shut down the processing tool.

13. The system of claim 8, wherein the data collection unit is further adapted to send the accumulated state data to the fault detection unit while a processing piece is being processed by the tool.

14. The system of claim 8, wherein the processing tool is a semiconductor fabrication tool, and the processing piece is a silicon wafer.

15. An apparatus, comprising:

an interface adapted to receive operational state data from a processing tool and to provide the operational state data;

a controller adapted to:
receive the operational state data from the interface;
determine if a fault condition exists with the processing tool based on the operational state data received from the interface; and
perform a corrective action on the processing tool in response to the presence of a fault condition,

wherein the controller is adapted to perform the predetermined action comprises the controller adapted to

**Appx78**

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 10 of 11

US 6,725,402 B1

9

send a signal to the interface reflective of the predetermined action.

**16**. The apparatus of claim **15,** wherein the controller is adapted to shutdown the processing tool in response to the presence of the fault condition.

10

**17**. The apparatus of claim **15,** wherein the controller is adapted to compare at least a portion of the operational data to model data to determine if a fault condition exists.

\*   \*   \*   \*   \*

Applied Materials, Inc. Ex. 1001
Applied v. Ocean, IPR Patent No. 6,725,402
Page 11 of 11

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared in a proportionally spaced typeface in 14-point font and includes 9,077 words, excluding the parts exempted under those Rules.

*/s/  Joseph J. Zito*
Joseph J. Zito

*Attorney for Appellant*
*Ocean Semiconductor LLC*